**CONTINENTAL CASUALTY COMPANY**

v.

**ASSOCIATED PIPE & SUPPLY CO.,**
**Inc., et al.**

**TEXACO, INC.**

v.

**OFFSHORE GATHERING CORP. et al.**

**UNDERWATER SERVICES, INC.**

v.

**OFFSHORE GATHERING CORP.**

**COMMONWEALTH OIL COMPANY, Division of Jupiter Corporation, Inc.**

v.

**OFFSHORE GATHERING CORP. et al.**

**UNITED TUGS, INC.**

v.

**CONTINENTAL CASUALTY COMPANY, Texaco, Inc. and Offshore Gathering Corp.**

Civ. A. Nos. 12713, 12714, 12681, 12701 and 12579.

United States District Court
E. D. Louisiana,
New Orleans Division.

June 4, 1969.

A. Morgan Brian, Jr., New Orleans, La., for Continental Casualty Co. and Texaco, Inc.

Daniel P. Hurley, New Orleans, La., for Texaco, Inc.

Joseph E. Friend, New Orleans, La., for Industrial Welding Supply Co.

Cicero Sessions, New Orleans, La., Edward T. Diaz, Golden Meadow, La., for United Tugs, Inc.

O. P. Carriere, New Orleans, La., for O. S. Justus, d/b/a Globe Equipment Co.

Warren Rush, Lafayette, La., for Glaser Construction Co.

Robert Lobrano, New Orleans, La., Edmond Fitzmaurice, New Orleans, La., for Golden Meadow Oil Co. and Ellzey Marine Supplies.

Warren M. Simon, Jr., New Orleans, La., for New Orleans Armature Works, Inc.

Richard Blaise Jurisich, New Orleans, La., for Tassin Marsh Equipment Co.

John M. Page, New Orleans, La., for Circle, Inc.

Charles Hanemann, Houma, La., for Foods & Services, Inc.

Gilbert Cohen, Gretna, La., for Boehck Engineering Co.

Peter H. Beer, New Orleans, La., Richard Cocke, Houston, Tex., for Commonwealth Oil Co.

K. J. Gilly, Lawrence K. Benson, Jr., New Orleans, La., for Thomas Jordan, Inc. and Assoc. Pipe & Supply.

E. Howard McCaleb, New Orleans, La., for Empire Machine Works, Inc.

Richard L. Bodet, New Orleans, La., for Irby Charping and Ellzey Marine Supplies.

Stephen K. Faulkner, Jr., New Orleans, La., for Hauser & Despaux.

Patrick E. Carr, Metairie, La., for Marshland and James Lambert.

CASSIBRY, District Judge:

Texaco, Inc. (Texaco) and Continental Casualty Company (Continental) are plaintiffs in two interpleader actions and defendants in the various consolidated, separate suits.

Texaco, Inc., (Texaco) and Continental poration (Offshore) entered into a contract dated as of October 27, 1961, and executed in writing November 1, 1961, which called for Offshore as prime contractor to construct for Texaco as owner a partially underwater-underground pipeline gathering system to service Texaco's offshore oil and gas field known as South Pass Area Block 37. The pipeline is known as the "South Pass Gathering System." In connection with the above contract Offshore provided Texaco a bond with Continental as surety. The original bond dated November 29, 1961 was in the amount of $397,000. By rider dated December 11, 1961 the amount of the bond was increased to $442,000. Neither the contract nor the bond and its rider were ever recorded. The work under the contract was completed by Offshore and accepted by Texaco on May 28, 1962. At that time many parties who had furnished labor, materials, equipment or services in connection with the contract were unpaid. After completion of the job and after deducting the progress payments which it had made to Offshore, Texaco claimed it still had on hand $178,796.16 which it owed to Offshore under the contract. But inasmuch as Offshore had failed to pay the many suppliers and creditors, Texaco withheld the balance which it was entitled to do under its contract with Offshore, filed its interpleader and placed in the registry of the court an interpleader bond in the amount of $178,796.16.

Continental also filed an interpleader action and has placed in the registry of the court an interpleader bond in the amount of $442,000. Many of Offshore's creditors have filed claims in the Texaco interpleader and some of these creditors, having recorded liens, also filed claims under Louisiana lien laws. Some creditors also filed claims against Continental under the bond. Texaco concedes that if no lien law is applicable to the work performed by Offshore, it (Texaco) will be a mere stakeholder and have no interest in the fund. If, on the other hand, Texaco is liable to any claimants, it asserts an interest in the retained funds for reimbursement of any sums it is called upon to pay. Continental denies any liability in the matter except as to indemnity it may owe Texaco to reimburse it for losses incurred as a result of claims filed under lien laws and claims reimbursement out of funds retained by Texaco. In addition to the many claims made by creditors in the interpleader actions, three suits were filed by parties directly against Texaco and Continental. These suits have been consolidated with the interpleaders and all have been tried together.

Two of the claimants, United Tugs, Inc., (United), and Thomas Jordan, Inc., (Jordan), claim Offshore made assignments to them of contract funds in Texaco's hands which Texaco agreed to, and that Texaco independently guaranteed to pay United and Jordan what was due them to insure completion of the job.

After a preliminary trial on certain issues this court found in favor of the claimants and against Texaco and Continental. That opinion is dated December 13, 1967 and is reported at 279 F. Supp. 490. The court found:

(1) That the construction project performed by Offshore was of a nature contemplated by and within the scope of the Louisiana Private Works Stat-

ute (Private Works Act), LSA–R.S. 9:4801 *et seq.*

(2) That the construction project performed by Offshore is of a nature contemplated by and within the scope of the Louisiana Oil, Gas and Water Well Statute (Oil Well Act), LSA–R.S. 9:-4861 *et seq.*

(3) That Continental is liable to those creditors who have claims of a nature covered by the Private Works Act, even though they have not recorded a lien.

(4) That Texaco unconditionally promised to pay United and Jordan independent of the retained funds.

The court then tried all of the individual claims on the merits and Texaco, Continental and many of the claimants have submitted supplemental briefs. While it was not contemplated that the parties would do so, Texaco and Continental have ably reurged their previous defenses on issues previously decided along with innumerable additional defenses as to each claimant. The court has carefully reviewed and reconsidered its original findings and, believing them to be correct, hereby reaffirms them in toto. One portion of that opinion, however, needs elaboration and explanation and that has to do with the finding that Texaco personally guaranteed or assumed the debts of United and Jordan. Texaco contends that the court's opinion on this point is "inconsistent and internally self-contradictory." The alleged inconsistency apparently stems from the court's several statements in the text of the opinion to the effect that "Texaco obligated itself to pay certain sums to them (United and Jordan) out of money withheld from Offshore, "but despite this seeming limitation the court concluded that " * * * there was an *unconditional* promise by Texaco to pay United and Jordan, *independent* of the retaining funds * * *" I did find as a fact that Texaco's promise and guarantee to United and Jordan was to the effect that they *would* be paid out of *retained* funds, but Texaco went further than that and assured Jordan and United that the retained funds would amount to more than enough to pay their claims. Having done so, Texaco cannot now supply its own proviso that it would pay only if funds were available, or if funds were available United and Jordan must take their place in line with all the other creditors. Texaco induced United and Jordan to leave their equipment on the job so that the job could be finished without interruption. Jordan and United cooperated, relying upon Texaco's promise that they would be paid. Texaco may not later default on its promise by saying that what it meant was that it would pay *if* there were no other creditors and *if* the retained funds were sufficient to take care of it, and *if* it is otherwise legal to pay out the money. United and Jordan relied on Texaco's promise that they would certainly be paid because they, and everyone, knew by then that Offshore was in serious financial difficulty. Texaco, therefore, is liable personally to United and Jordan on its independent promise that they would be paid.

## I.

### MISCELLANEOUS ISSUES

#### A. *State Sales Tax*

Texaco and Continental contend that, since most of this pipeline project occurred on the Outer Continental Shelf, they are not liable for any state sales tax paid by the claimants. The Outer Continental Shelf Lands Act (43 U.S. C.A. § 1331 et seq.) provides that "State taxation laws shall not apply to the Outer Continental Shelf." That Act defines the Outer Continental Shelf as "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in Section 1301 of this title * * *." Section 1301 says that "lands beneath navigable waters" means:

(1) all lands within the boundaries of the respective States covered by nontidal waters (which are not relevant here), and * * *

(2) all lands permanently or periodically covered by tidal waters up

to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line and * * *

(3) * * * made lands (which are not relevant here).

■ The Submerged Lands Act, 43 U.S.C.A. §§ 1301–1312 quit claimed to each of the coastal states all lands within three geographical miles distant from its coast line. It is clear then, that the Outer Continental Shelf Lands Act applies only to lands which are outside of Louisiana's boundary. This boundary in the East Bay Area has never been set. Litigation to set Louisiana's boundary in this area is still pending before the United States Supreme Court. United States v. Louisiana, 394 U.S. 11, 89 S.Ct. 773, 22 L.Ed.2d 44 (March 3, 1969).

■ Whether this work was performed on the Continental Shelf or not was a matter of defense and Texaco did not meet its burden of proving that the work occurred on the Outer Continental Shelf as it is described in the Act. They are therefore liable for the sales tax paid by those claimants who are otherwise entitled to recover on their main demands. There is nothing in the October 12, 1956 agreement between the United States and Louisiana that administratively fixes the location of the Outer Continental Shelf.

### B. *Texaco's Claim for Attorney's Fees*

■ Texaco claims that it is entitled to receive out of the deposited fund, a reasonable attorney's fee for preparing and handling its interpleader since it is a disinterested stakeholder. It suggests that $10,000 would be a reasonable fee. I find that Texaco is not a true stakeholder since it asserts that it is entitled to be fully reimbursed from the remaining contract funds for the amount of its liability to various claimants. In addition, Texaco has had the use and benefit of the funds over the past several years and in any event this is ample compensation to them.

### C. *Claimants' Right to Attorney's Fees*

■ Texaco contends that none of the claimants can recover 10 percent attorney's fees under any of the various statutes. This is correct as to all except the Oil Well Act. That statute clearly provides for such fees and they will be awarded in appropriate cases.

### D. *Continental's Liability Under its Bond*

■ I have already held that Continental's bond was statutory and therefore all claimants who have claims of a nature covered by the Private Works Act may recover against Continental even if they have not recorded a lien, provided suit against Continental was timely filed. All claims asserted against Continental in either interpleader will be regarded as a separate and independent suit against the surety.

Even though Continental's bond is statutory, the maximum amount of Continental's aggregate liability to all claimants is limited to $147,334.00 which is one-third of the $442,000 price of the Texaco-Offshore contract. If a statutory bond's actual written provisions go beyond the minimum requirement of the statute, the excess parts are not enforceable against the surety by the statutory beneficiaries. Cole v. Schexnadire, 163 La. 132, 111 So. 651 (1927); Ingargiola v. Cappell, 13 Orl.App. 321 (1916).

### E *Texaco's Incorrect Computation of Retainage*

■ In paragraph IV of its complaint, Texaco admits that it has retained in its "possession a final balance of contract funds in amount of $178,798.12 * * *"

Texaco's computation of the retainage is incorrect. At the October, 1967 portion of the trial, Charles Hill, an accountant in the office of the comptroller of Texaco, testified that Texaco debited against the retainage under the contract the amount of $14,204.89 due by Offshore Gathering to Texaco's sales division for materials purchased by Offshore

in connection with the construction of the gathering system, and credited the same amount to Texaco's sales division. No disbursement was made, and no receipt from Offshore Gathering for this amount was produced. Mr. Hill characterized it as an "interdepartmental transaction." He further testified that it took place at some time during October of 1962. By then Texaco was actually aware of Offshore Gathering's financial failure because several liens and lawsuits had already been filed. Texaco had already filed its interpleader. Texaco paid to itself from retainages its own claims against the insolvent principal contractor, without likewise paying any other creditor of the principal contractor.

■ If Texaco's actions in withholding $14,204.89 in favor of itself, rather than taking its place among the other creditors, can be justified at all, they must be justified under the Louisiana codal provisions on compensation of debts. In certain cases, compensation operates to extinguish reciprocal debts between two persons. La.Civ.Code, art. 2207 (1870). When compensation occurs, it does so by operation of law, without any action on the part of the debtors. La.Civ.Code, art. 2208 (1870). But compensation does not "take place to the prejudice of the rights acquired by a third person * *." La.Civ.Code, art. 2215 (1870). This article contemplates a situation such as the present case, in which one of the parties occupying the dual status of creditor and debtor is insolvent, and the other finds himself unqualifiedly liable to pay his debt but is thrown in with the other creditors for the purposes of collecting his claim. To prevent undue preferences, "compensation can never take place to the prejudice of rights acquired by third persons," which prejudice could occur in the case "of the bankruptcy of the debtor." 1 Aubry & Rau, Droit civil francais 248 (La.State Law Inst.ed. 1965).

The claimants' rights were prejudiced because the retainage was and is far from sufficient to pay all their claims in full.

To recover its claim Texaco should have filed and proved a claim against Offshore Gathering, just as any other claimant. In any event, the retainage is held to be $193,003.05.

## II.

## CLAIMS UNDER THE PRIVATE WORKS ACT GENERALLY

■ Since Texaco did not record the contract and bond, it is personally liable to those who made a proper claim, and its lease and lease interests are subject to lien by those who made proper claims. To qualify for either lien rights or personal claim, the claim must have been recorded 60 days after the date of last performance of labor or furnishing of materials to the job, and suit must be brought within a year thereafter. Filing a claim in the interpleader within one year of recordation satisfies the requirement that a suit be filed. As to lien rights in Texaco property there is the additional requirement that the lien be annually reinscribed. Lumber Products, Inc. v. Crochet, 244 La. 1060, 156 So.2d 438. Reinscription is not necessary for personal action. Rathborne Lumber & Supply Co., Inc. v. Falgout, et al., 222 La. 345, 62 So.2d 507 (1952). Offshore's work was completely finished, turned over and accepted by Texaco on May 28, 1962. Therefore, only lien claims filed in Plaquemines Parish on or before July 27, 1962 would be enforceable under the Private Works Act.

■ Louisiana Courts have held that the Private Works Act gives its statutory lien and personal rights against owner and surety solely to materialmen claimants whose furnishings are used *in* the constructed facility. Bernard Lumber Co. v. Sayre, 230 La. 17, 87 So.2d 713 (1956); Mayronne Lumber & Supply Co. v. Houston Fire & Casualty Ins. Co., 225 La. 1017, 74 So.2d 198 (1954); Laney Co. v. Airline Apartments, 223 La. 1000, 67 So.2d 570 (1953); Sundbery's, Inc. v. Price, 117 So.2d 328 (La.App. 1 Cir. 1960); Mestayer Lumber Co. v. Tessner, 101 So.2d 238 (La.App.1958); Dix-

ie Building Material Co. v. Chartier, 8 La.App. 469 (1928). However, the materialmen need only prove delivery to the job site to establish a prima facie case which the adverse party (owner or surety) can rebut only by clear proof that the claimant's materials in fact did not get incorporated into the structure. Mestayer Lumber Co. v. Tessner, *supra*; Bernard Lumber Company v. Sayre, *supra*. Texaco questions the sufficiency of the proof of the various claimants purporting to show delivery to the premises or job site. When a building being constructed on land is involved, proof is much easier to produce than when the job site is located out on the Gulf of Mexico. Claimant is only required to show by a preponderance of the evidence, or that it is more likely true than not true, that the supplies and materials were delivered on the job. Materialmen need not sell the material and then follow it all the way to the site. Laney Co. v. Airline Apartments, *supra*; Hortman-Salmen Co. v. Raymond, 13 La.App. 490, 127 So. 452.

### EFFECT OF ACT 60 OF 1960

 Whether several of the claimants recover under the Private Works Act will depend upon the effect Act 60 of 1960 had upon L.R.S. 9:4801. Prior to the amendment the Act read in part as follows:

> "Every contractor, sub-contractor, architect, engineer, master-mechanic, mechanic, cartman, truckman, workman, laborer, or furnisher of material, machinery, or fixtures, who performs work or furnishes material * * * has a privilege * * *."

A dispute arose over whether rental of movable property was covered. The problem arose over rented equipment which, after use on the job, was removed from the job and used again on some other job. In 1959 the Louisiana Court

of Appeals in National Surety Corp. v. Highland Park Country Club, Inc., 111 So.2d 811, 812, found that the Act provided a privilege for rented "construction machinery, including pumps, hoses, an air compressor, a cement mixer," etc., none of which were rented *manned*. The Louisiana Supreme Court reversed at 240 La. 747, 125 So.2d 151, 3 A.L.R.3d 567 (1960) holding that L.R.S. 9:4801 must be read: "Every furnisher of machinery *who performs work*" is covered. (emphasis added, p. 755, 125 So.2d p. 153). The implication was that even if it was rented equipment, if it was manned, and if work was performed, it was covered.

After the Court of Appeals' decision in the *National Surety Corp.* case and six months before the Supreme Court reversed the Court of Appeals, the Louisiana Legislature amended 9:4801, inserting an exclusionary clause as follows:

> "Every contractor, sub-contractor, architect, engineer, master-mechanic, mechanic, cartman, truckman, workman, laborer or furnisher of material, machinery or fixtures, *exclusive of anyone who rents or leases movable property*, who performs works or furnishes material * * * has a privilege * * *." (emphasis added).

Texaco and Continental contend that the amendment removes from coverage rental equipment, whether manned or not. A commentator (Robert Pascal, 21 La.L.Rev. 62) suggests that the amendment was passed "apparently only for clarification of language." In appellants' brief in the *National Surety Corp.* case, before the Supreme Court, the Court's attention was directed to the 1960 amendment only to show legislative intent to exclude rented movables. The amendment was not mentioned in the Court's decision, but since they were aware of its existence I think it logical to assume that they did not feel the amendment in any way overruled or diluted *National Surety*.*

---

* This case is replete with complex state law problems, concerning which Louisiana Courts have had little opportunity to address themselves. If this suit finds its way to the Court of Appeals, I am sure they will become keenly aware of the need for a certification procedure by which the Louisiana Supreme Court could

*National Surety* holds that the word "machinery" includes "equipment" and one who provides "equipment" and who performs work or supplies manpower is covered by the Act. Additionally, it considerably broadens the definition of machinery to cover equipment, tools, etc. But it is just as clear that an agreement to simply supply unmanned equipment on an hourly rental basis is not covered.

## SUBCONTRACTORS

Continental and Texaco concede that the Act clearly covers every subcontractor.

■ Important considerations in determining whether a claimant is a subcontractor are:

(a) whether his subcontract was for the performance of part or all of another contract. Webster New International Dictionary, Second Edition 1944);

(b) whether it was an identifiable unit portion of the larger work;

(c) whether the subcontractor was responsible for undertaking and completing the specified unit of work;

(d) whether he directly deployed, supervised and controlled his own men and equipment in their performance of his unit of the work, through his own foreman or other supervisory employees.

Jesse F. Heard & Sons v. Southwest Steel Products, La.App., 124 So.2d 211; American Creosote Works, Inc. v. City of Monroe, 175 La. 905, 144 So. 612 (1932).

The latter condition would not require that all supervision be under his direct control. Overall supervision of the job might be in the charge of the general contractor so long as immediate supervision is under the control of the subcontractor.

determine these knotty legal issues. See Judge Brown's opinion in Martinez v.

## III.

## OIL WELL ACT

■ This statute provides for a lien against Texaco property. No other type claim is recognized or allowed under this law and no bond is required. It does not permit liens against the land on which the wells are located. It allows the lien to lie against the well itself, related paraphernalia in the lease, and the minerals produced therefrom.

■ Accordingly, a lien under the Oil Well Act in this case bears against the entire South Pass Gathering system owned by Texaco, the proceeds of all oil and gas produced from wells located at "A", "B", "C" and "D" structures, which inure to the working interest, the wells themselves and the applicable leases.

■ Texaco and Continental contend that under Section 4862 materials must be furnished directly to a well or wells and to the owner or operator or producer-driller of the wells in order to qualify for a privilege. Such interpretation is said to be warranted under the rule of stricti juris. This is, again, a rather tortured and strained reading of the statute and completely ignores the clear language of Section 9:4861 which provides a privilege for *any person* who furnishes material for *or in connection with* the drilling of a well or wells. The legislative intent is clear. It meant to include every item of labor on, for or in connection with the drilling or operation of a well or wells. Courts have no right under the guise of the doctrine of stricti juris to frustrate the intent of the legislature by such an interpretation as that proposed by Texaco and Continental. Stricti juris does not require an interpretation completely foreign to obvious and clear legislative intent. Legislative intent would be clearly frustrated if an "owner, operator, producer or driller of the well or wells * * *" did not

Ingram Court Apartments (April 29, 1969).

include an owner's contractor. Article 14 of the Louisiana Civil Code provides that:

"The words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular use of the words."

Speaking of La.R.S. 9:4861, the Louisiana Supreme Court has said:

"The general and prevailing rule of construction of such statutes, not only in Louisiana, but elsewhere, is that they are for the benefit of persons who furnish material which is consumed in connection with, or becomes worked, or incorporated, into the property of another." Oil Well Supply Co. v. Independent Oil Co., 219 La. 936, 54 So.2d 330 (1951).

Commenting on a similar statute the Louisiana Supreme Court said:

"It is true that privileges, common to the civil law, are in derogation of common right and are to be strictly construed; but if the language of the law conferring the lien is clear and unambiguous, if it contains no exceptions or qualifications, it should be construed and enforced as written." L. P. Stephens, Inc. v. Kellogg Lbr. Co., 18 La.App. 507, 509, 137 So. 769, 770 (1931).

■ Accordingly, the oft-cited rule that lien statutes are to be construed stricti juris should be applied only when the terms of the statute are *not* "clear and unambiguous." Otherwise they should be interpreted fairly and reasonably, and in accord with general and popular usage.

## RECORDATION

■ This case has many difficult legal problems but none more troublesome than the question of whether recordation is necessary to preserve a lien under the Oil Well Act. The language of that act, particularly R.S. 9:4862, suggests that recordation per se is not necessary. It provides that "If a notice of such claim or privilege * * * is filed for record and inscribed . * * * within ninety days * * *, the privileges are superior to all other privileges or mortgages against the property * * *." The clear implication is that if you choose not to record you will lose that special ranking of your privilege but not the lien. Nothing in the statute suggests anything to the contrary. The Louisiana Constitution art. 19, § 19, provides that "Privileges on movable property shall exist without registration of same, except in such cases as may be prescribed by law." The legislature could have specifically provided that registration was required as it did in the Private Works Act but it did not choose to do so. Consequently, since the statute does . not so provide, recordation is not required.

■ Texaco cannot be held personally liable to any claimant who otherwise may be allowed a recovery under this Act.

■ The Oil Well Act requires no bond. Therefore, no claimant can recover under the Oil Well Act from Continental since its bond is conventional as to that statute.

The claims cognizable under the Oil Well Act fall into two broad categories— (1) laborers and (2) furnishers. Most claims in this suit are made by alleged furnishers. Furnishings do not have to become permanently attached to or become a part of the well in order for a lien to be valid. In this respect it is different from the Private Works Act.

## IV.

## EACH CLAIM ON ITS MERITS

Now I will consider each claim on its merits in the light of the court's finding on liability and discussions of the two Acts' general coverage.

The following 27 originally named defendants were served in one or the other or both interpleaders but did not file any responsive pleadings or otherwise

make any appearances, through counsel or any other way. There will, therefore, be judgment against all and in favor of Texaco and Continental. Those defendants are:

1. Ayers Materials Co., Inc.
2. Bourg Truck Line, Inc.
3. S. E. Brister, d/b/a Vela's Garage
4. Sam Carline, Inc.
5. Chicago Pneumatic Tool Co.
6. Jules Cochiara, d/b/a Cochiara's Shipyard
7. Collinstex Equipment, Inc.
8. Crescent Electronic Supply, Inc.
9. Dixie Television Service
10. Arthur Duvic's Sons
11. Jasper Ewing & Sons, Inc.
12. George Engine Co., Inc.
13. Goddard Machinery Co., Inc.
14. Gweco, Inc.
15. Arthur Haley, d/b/a Barataria Tavern Service Station
16. Ingersoll-Rand Co.
17. George N. Jacomine, d/b/a Dreamland Motel
18. M & P Building Sales Co.
19. Marine Catering Service, Inc.
20. J. Ray McDermott & Co., Inc.
21. Morris-Young-Owens Co., Inc.
22. Walter Mumphrey, d/b/a/ Mumphrey's Radio Dispatch Service
23. New Orleans Copper Works, Inc.
24. C. A. Roeder, d/b/a Red's Super Service
25. Roland's, Inc.
26. Southern Bell Telephone & Telegraph Co.
27. Television Engineering Co., Inc.

When the above 27 defendants are eliminated there is a balance of 44 claimants who did file responsive pleadings or otherwise appeared and asserted claims in either one or both of the interpleaders.

Of those 44 claimants, however, the following 4 subsequently dropped their claims and withdrew from the proceedings, voluntarily dismissing their claims with prejudice effective on the dates following their names:

1. Evans Cooperage Co., Inc. (July 17, 1967)
2. Marsh and McLennan, Inc. (January 28, 1963)
3. Howard T. Tellepsen, d/b/a Tom Hicks Transfer Co. (October, 1967)
4. Wigwam, Inc., d/b/a Candlelight Inn (June 16, 1967)

---

Of the balance of 40 claimants, the following 21 did not satisfactorily prove their claims against either Texaco or Continental and accordingly, their claims will be dismissed.

1. Acme Truck Line, Inc.
2. Bacas (Buras Drug Store)
3. Alcide Bernard
4. Bertucci Brothers Construction Co., Inc.
5. B & G Lumber Co.
6. Crescent Welding Supply Co., Inc.
7. Electronic Services, Inc.
8. Frolich Brothers Marine Divers, Inc.
9. Vincent Frolich
10. Gerhardt's Inc.
11. Golden Meadow Oil Co., Inc.
12. Leson Chevrolet Co., Inc.
13. Marshland Aviation, Inc.
14. New Orleans Armature Works, Inc.
15. New Orleans Blueprint & Supply Co., Inc.
16. Pipe Line Service Corporation
17. Charles E. Spahr
18. D. E. Stearns Co.

19. Frank Stipelcovich, d/b/a Delta Aire Esso Servicenter
20. Underwater Services, Inc.
21. Williams Pressure Service Co.

The remaining 19 claimants will now be considered.

## A. ASSOCIATED PIPE AND SUPPLY COMPANY, INC.

Offshore Gathering Corporation purchased material and supplies and rented anchors from Associated during the time Offshore was constructing Texaco's South Pass Gathering System. It was proved at the trial that Offshore's Job #129 was Texaco's gas gathering pipeline job.

The material and supplies consisted of manila and wire rope, shackles, nuts, bolts and other things which, according to the testimony of witness Bob Lester, who was Offshore's purchasing agent, are common supplies used in the construction of pipelines.

Bob Lester and Mrs. Valarian Johnson, Secretary-Treasurer of Associated, who was the clerk who received the orders, testified regarding the method which was used in ordering the material, supplies and anchors. Mr. Lester would telephone the orders to Mrs. Johnson, and would tell her what job the orders were for. Mrs. Johnson would type the dray receipts and the invoices, showing the job number on each. The supplies were picked up by Mr. Lester or, more frequently, by a Mr. Chatterton, and in all but one case the dray receipts were signed by the person making the pick-up.

From Associated's headquarters in Harvey, Louisiana, the supplies were taken to the Texaco dock in Venice, Louisiana, where they were loaded on barges for transportation to the construction area.

Within a short time following the delivery of an order, Bob Lester would write the job number for which a purchase was made on the invoice, and initial the invoice. This was part of Mr. Lester's routine, because in this way the cost of supplies was charged to the proper job. Mr. Lester testified that, as purchasing agent, he would have been notified of any diversion of supplies from one job to another, and that he was not notified of any such diversions with regard to the invoices on which he wrote "Job 129."

The materials, supplies and anchors were ordered for Job 129, were receipted for on a receipt showing Job 129, were taken to where supplies for Job 129 were shipped to the construction area, were invoiced showing Job 129, and were approved by the purchasing agent for Job 129. I conclude, therefore, that the materials and supplies and the anchor were used on the South Pass Gathering System job.

### 1. *The Oil Well Act*

The Court has already decided that the entire South Pass Gathering System was constructed in connection with the operation of the wells serviced by the system. The evidence shows that Associated is entitled to a lien under the Oil Well Act, because it furnished material, supplies and equipment for this operation.

On September 17, 1962 Associated filed suit in State Court against Offshore which was removed to the Federal Court where judgment was obtained in the amount of $11,352.00. On October 31, 1962 Associated counterclaimed against Texaco in the Texaco interpleader and against Continental in the Continental interpleader. Associated filed a lien affidavit on June 15, 1962 but did not reinscribe.

Witness Bob Lester testified that the materials and supplies furnished by Offshore were pipeline construction supplies. Mrs. Johnson of Associated testified to the same effect. In addition, anchors were required for this offshore construction project.

No evidence was introduced to show that any of the items furnished by Associated were not the sort of items necessary to construct the South

Pass Gathering System. In view of the fact that the only testimony in the record is to the effect that the items furnished by Associated are necessary in a project of this kind, the Court holds that they are the sort of items for which a lien is given under the Oil Well Act.

Counsel for Continental and Texaco attempted to show that neither Mrs. Johnson nor Mr. Lester saw the materials, equipment and supplies furnished by Associated after they were put on barges at the Texaco dock in Venice. Neither of these witnesses followed the supplies out into the Gulf of Mexico, and watched as the coils of rope were cut up and used on the job, and as the nuts, bolts, pins and shackles were used on the job. The question is whether the evidence which Associated has placed in the record is sufficient to show that the materials it furnished were covered by the Oil Well Act.

The materials, supplies and equipment furnished by Associated were taken to the Texaco dock in Venice where they were put on barges waiting to go to Job 129. There was no testimony that any diversion of supplies occurred. There is only the suggestion, raised by Texaco's questions that the materials might have been delivered somewhere else. Such a suggestion is without any foundation in the record. On the contrary, all the evidence points to the fact that these materials, equipment and supplies were used in the construction of the South Pass Gathering System.

■ Associated's total lien claim is $10,563.03. Of this, $449.62 is due for anchor rentals. It is clear, however, that the Oil Well Act draws no distinction between furnishing equipment and supplies by sale and furnishing them by rental. Sutton-Zwoile Oil Co. v. Barr Petroleum Corporation, 197 So. 432 (La.App.1940) held that the leasing of a drilling rig was a furnishing within the Oil Well Act then in force, 145 of 1934. The present Oil Well Act, R.S. 9:4861 et seq., has not changed the

language of the paragraph granting the lien in any way to cast doubt on this case as a precedent. In Sutton-Zwoile the court clearly said:

"In leasing the drilling rig to defendant, Koch, within the meaning of the statute, 'furnished' same to it to drill the well. *The fact that their relation was that of lessor and lessee does not affect their relative rights and duties under the above quoted part of the act. * * * "* 197 So. at 435 (Emphasis added)

The Supreme Court of Louisiana recently considered the reasoning of the Sutton-Zwoile case in a case involving the Private Works Act: National Surety Corporation v. Highland Park Country Club, Inc., *supra*, and approved *Sutton-Zwoile* by inference.

Accordingly under the Oil Well Act, Associated is entitled to a judgment recognizing Associated's lien in the amount of $10,563.03, plus interest at five percent per annum from July 29, 1962, 30 days after the date of the last payment on account on the aggregate of the above sums, plus ten percent attorney's fee, for $1,056.30.

### 2. *Private Works Act Coverage*

■ The material furnished by Associated did not become part of the completed pipeline but was essential in laying the line. It was effectively consumed. The wire and manila rope was cut into various lengths to suit the requirements of the job. Bob Lester testified that nothing except the anchor furnished by Associated was salvaged from the job. As a result, the materials furnished by Offshore for the construction of the South Pass Gathering System were "used in" the construction. Long Bell Lumber Co. v. S. D. Carr Construction Co., 172 La. 182, 133 So. 438 (1931). The value of the materials furnished and used in the work, less anchor rentals which are excluded, is $10,113.41. Continental was timely sued and is therefore subject to judgment against it by Associated. There will, therefore be

judgment in favor of Associated and against Texaco and Continental in that amount plus interest at five percent per annum from July 29, 1962.

## B. BOEHCK ENGINEERING CO., INC.

█ Boehck counterclaimed against Offshore, Texaco and Continental on October 24, 1962. Boehck satisfactorily proved to the court that it supplied two air compressors which were delivered and used by Offshore on the Texaco Gas Gathering job.

It has a privilege under the Oil Well Act and is entitled to a judgment recognizing that privilege in the amount of $3,724.33, plus ten percent attorney's fees, plus interest from October 24, 1962.

Boehck's lien recordation was made August 3, 1962 which was untimely under the Private Works Act. Therefore, under the Private Works Statute, Boehck is not entitled to a lien against Texaco's lease interest and has no direct action against Texaco. It may not recover against Continental because rentals of equipment are specifically excluded from coverage under the Private Works Act.

## C. IRBY CHARPING

Charping claimed against the deposited funds in the Texaco interpleader and claimed against the bond in the Continental interpleader.

Irby Charping testified that he was doing business as Irby Charping, providing crew boat services pursuant to a contract he entered into with Offshore. These services were contracted for by Bob Lester on behalf of Offshore for the purpose of transporting personnel and equipment to and from the job site.

The services consisted of providing crew boats in sufficient quantities as needed and dictated by Offshore to carry Offshore, Texaco, and any other personnel to and from the job site so that the work on the Texaco South Pass Gathering System could be completed. Additionally required and provided was the service of transporting items of equipment and supplies. Mr. Charping provided a Captain for each crew boat, whose salary he was required to pay separately from his earnings under the contract.

Mr. Charping testified that on numerous occasions he was at the Texaco dock in Venice when the crew boats departed. Based on the information that his Captains furnished him, invoices were prepared by his wife and submitted to Offshore for payment.

Mrs. Charping corroborated the testimony of her husband to the extent that she did prepare and send to Offshore invoices for the services that were performed.

Bob Lester testified that he did contract with Charping for the services as outlined above, and that he verified the invoices as they were received. Mr. Lester further testified that on several occasions he saw the crew boats depart from the Texaco dock.

Mr. Milton Borell testified that during the construction of the South Pass Gathering System, he was a Texaco employee and "resident inspector"; that is, the inspector who was at the job site every day during which the construction was being performed. He corroborated the fact that Charping's crew boats were used almost exclusively on the Texaco job and that he personally saw the crew boats arrive and depart from the job site on a daily basis.

The invoices setting out the charges by Charping to Offshore for the Texaco job were admitted in evidence without objection, and no evidence to dispute the claim of Charping was introduced on behalf of Texaco or Continental.

The lien affidavit was recorded on behalf of Irby Charping on July 6, 1962.

### 1. *Oil Well Act*

█ Clearly, the services performed by Charping were covered by the Oil Well Act. The Oil Well Act does not distinguish between furnishing equipment, supplies, or services by sale and

furnishing them by rental. Sutton-Zwoile Oil Co. v. Barr Petroleum Corporation, *supra*.

Therefore, Charping would ordinarily be entitled to a privilege against the property of Texaco, Inc. in the amount of $22,865.00, plus ten percent attorney's fees, plus interest from November 14, 1962 under the Oil Well Act. Charping would not be entitled to $679.50 for damages.

### 2. *Private Works Act*

■ Since Charping's work was done primarily away from the job site and was not directly concerned with the on-site construction, he is not a subcontractor as contemplated by the Private Works Act, but he is a furnisher of manned equipment or machinery. Since he did not reinscribe he would not be entitled to recover under the Private Works Act by lien but would be entitled to judgment against Continental and for the same reason he would also ordinarily be entitled to recover against Texaco in the same amount. No judgment against Offshore was requested.

Whether Charping is entitled to judgment against Texaco in any event is subject to question. Some doubt has arisen as to whether Charping's pleadings are sufficient to support a judgment in his favor except as to the retainage. I will hear further from counsel on this question.

### D. CIRCLE INCORPORATED

During the course of the trial it was stipulated between counsel for Circle and counsel for Continental and Texaco that the legal relationship between Offshore and Circle with respect to the work performed by Circle on Texaco's South Pass Gathering System was that of prime contractor and subcontractor, as the evidence adduced clearly proved. Circle contracted with Offshore to dig a portion of the ditches into which the pipe was to be laid and to back fill after the pipe was down. It included "dredging" and "trenching." Circle's equipment was fully manned, operated and supervised by Circle employees. Further, through the testimony of Messrs. Grillot and Easley, it was proved conclusively that Circle performed the sub-contract work as described on Circle's invoices Nos. 286 and 366.

It was further stipulated that the principal balance due to Circle for the performance of the sub-contract work is $23,203.39, unless a payment received by Circle from Offshore on February 26, 1962 must be imputed to payment on account for work performed under the South Pass Gathering System sub-contract.

On July 16, 1962 Circle recorded an affidavit of lien with a statement and two invoices attached. There was no reinscription of the lien instrument. Circle's pleadings in these interpleaders, filed on February 7, 1963, included a cross-claim against Offshore, and cross-claims and/or counterclaims against Texaco and Continental.

There was ample evidence to prove that the outstanding principal balance owed by Offshore to Circle is $23,203.39. (It is unnecessary to consider the imputation question in this connection.) There was no evidence to the contrary. Accordingly, Circle is entitled to a judgment against Offshore in the sum of $23,203.39, together with five percent per annum interest thereon from February 7, 1963.

Texaco and Continental place in issue the imputation of a $20,000.00 payment received by Circle from Offshore on February 26, 1962, because the only declaration appearing on the check relative to what debt Offshore meant to discharge are the words "On Account." At the time of the payment in question Offshore owed Circle a balance of $22,047.50 on invoice No. 286, relating to work on the Texaco job, and the full amount of invoice No. 323, $32,780.00, relating to work on the Sibon Pipeline Crossing job.

The applicable Louisiana law with regard to imputation of payment is con-

tained in Articles 2163, 2165 and 2166 of the Civil Code, which provide:

Article 2163. "The debtor of several debts has a right to declare, when he makes a payment, what debt he means to discharge."

Article 2165. "When the debtor of several debts has accepted a receipt, by which the creditor has imputed what he has received to one of the debts specially, the debtor can no longer require the imputation to be made to a different debt, unless there have been fraud or surprise on the part of the creditor."

Article 2166. "When the receipt bears no imputation, the payment must be imputed to the debt, which the debtor had at the time most interest in discharging, of those that are equally due; otherwise to the debt which has fallen due, though less burdensome than those which are not yet payable.

"If the debts be of like nature, the imputation is made to the debt which has been longest due; if all things are equal, it is made proportionally."

 Under the jurisprudence, where the debtor fails to take advantage of the "right to declare" afforded by Article 2163, imputation by the creditor to any debt, at his discretion, pursuant to Article 2165, may be effected through some form of notice to the debtor, which imputation, where expressly or tacitly consented to by the debtor, is as binding on the debtor as though he himself had made the imputation. Wm. B. Thompson & Co. v. Sporl, 160 La. 352, 107 So. 135 (1926); Flower v. O'Bannon, 43 Ann. 1042, 10 So. 376 (1891). Tacit consent to the creditor's imputation may be established through silence over a long period of time, Robson & Allen v. McKoin, 18 Ann. 544 (1866); through the dealings and correspondence of the parties, Flower v. O'Bannon, *supra*, through the debtor's inspection of the creditor's books and failure to take exception to the imputation disclosed, Baker v. Smith, 44 Ann. 925, 11

So. 585 (1892), or merely through the debtor's failure to object. Electrical Supply Co. v. Eugene Freeman, Inc., 178 La. 741, 152 So. 510 (1933); McLear and Kendall v. Succession of Hunsicker, 30 La.Ann. 1225 (1878).

 In the event the debtor has imputed the payment, or has consented to and become bound by the creditor's imputation, the rules of legal imputation contained in Article 2166 have no application. Electrical Supply Co. v. Eugene Freeman, Inc., *supra*; Grand Lodge, Benevolent Knights of America v. Murphy Const. Co., 152 La. 123, 92 So. 757 (1922).

Applying the foregoing principles to the facts established by the evidence, it is apparent that, at the time of the $20,000.00 payment in question, Offshore did not declare what debt it meant to discharge, and Circle thereafter imputed the payment to the Sibon job, to which imputation Offshore consented and is bound.

From the statements of account received in evidence it is clear that the only payment made by Offshore to Circle from the date of the $32,780.00 invoice applicable to the Sibon job until a $12,780.00 payment made on June 25, 1962 was the $20,000.00 payment in question. On May 2, 1962 Mr. Mennis of Circle wrote to Offshore concerning assignment of $12,780.00 "which represents the amount outstanding due us for work on the Geismar Crossing for Sibon." The clear import of the quoted portion of the letter is the imputation by Circle of the $20,000.00 payment in question to the $32,780.00 invoice for work on the Sibon job leaving a balance of $12,780.00. Offshore obviously received this letter, as is evidenced by Offshore's letter of May 3, 1962 to Sibon Pipe Line Company, a copy of which was sent to Circle. On June 25, 1962 Offshore wrote to Circle enclosing its check in the amount of $12,780.00 "for statements rendered under our Sibon Pipe Line Company * * * Contract." No exception was

taken by Offshore in either its letter of May 3, 1962 or its letter of June 25, 1962 to Circle's imputation of the $20,-000.00 payment in question to the invoice for work on the Sibon job. In fact, the tenor of the June 25, 1962 letter suggests that the payment enclosed, which was in the amount Circle had stated was outstanding, represented final payment on the invoice. In any event, Offshore considered its account with Circle for the Sibon work paid in full by the $12,-780.00 payment (and, consequently, must have intended that the earlier $20,000.00 payment in question be applied on the Sibon invoice), for, on June 27, 1962, Offshore executed a "Contractor's Affidavit" for the purpose of obtaining the balance of contract funds from Sibon wherein it was stated in paragraph 4, that all sums incurred in the performance of its contract "have been paid." There is other evidence bearing upon the intent of the parties. Through the affidavit of Mr. Rowland Burton, custodian of Offshore's records, it is established that the voucher copy of the $20,000.00 check in question was found in Offshore's records stapled to a "check request" form and to a copy of Circle's $32,780.00 invoice for work on the Sibon job. On April 13, 1962 Mr. Mennis of Circle wrote to Texaco advising that Offshore owed Circle approximately $40,000.00 for work on the South Pass Gathering System, and that no payments had been received from Offshore on account of this work since February 9, 1962. (At the time of this letter Circle had rendered an additional invoice to Offshore for the Texaco job in the amount of $18,335.00, which amount, when added to the $22,047.50 balance due under the initial invoice for work on the Texaco job, resulted in a total amount due of $40,382.50).

From the foregoing it is clear that Offshore was fully aware of Circle's imputation of the $20,000.00 payment in question through Circle's letter of May 2, 1962, and consented to it tacitly by raising no objection in subsequent correspondence, if not expressly, through the tenor of its letter of June 25, 1962 and the execution of the "Contractors Affidavit" to receive final payment from Sibon. Accordingly, Offshore is precluded from urging any other imputation.

Continental and Texaco do not have any greater rights in the premises than Offshore. The rule is that the debtor's right of imputation granted by Article 2163 can be controlled by a surety or other third party only where such imputation would result in the perpetration of fraud on the surety by both the debtor and creditor, as, for example, where the creditor knows the source of funds from which the payment is imputed. Hortman-Salmen Co. v. Continental Casualty Co., 170 La. 879, 129 So. 515 (1930). Grand Lodge, Benevolent Knights of America v. Murphy Const. Co., *supra*. The same rule applies in limitation of the rights of a surety or other third party where the debtor does not declare to what debt the payment is to be imputed at the time of payment and imputation by the *creditor* follows, and is consented to either expressly or tacitly by the debtor. Electrical Supply Co. v. Eugene Freeman, Inc., *supra*; Wm. B. Thompson v. Sporl, et al., *supra*; Robson and Allen v. McKoin, *supra*. There is no suggestion of fraud in the imputation of the $20,-000.00 payment in question to the invoice for work on the Sibon job, and, consequently, Texaco and Continental have no right to question the imputation.

### 1. *Oil Well Act*

Since the nature of the work performed by Circle is within the scope of the Oil Well Act, Circle is entitled to a judgment recognizing its lien under the Oil Well Act in the amount of $23,203.39 plus interest from February 7, 1963, plus ten percent attorney's fees.

### 2. *Private Works Act*

The Private Works Act specifically includes subcontractors within its scope.

Accordingly, Circle is entitled to a judgment against Texaco and Con-

tinental in the sum of $23,203.39, together with interest thereon from February 7, 1963.

### E. CRAN-VELA RENTAL COMPANY

██ Cran-Vela supplied divers to the Texaco job. Cran-Vela satisfactorily proved that they performed work on Job #129. Cran-Vela therefore is entitled to a judgment recognizing its lien and privilege under the Oil Well Act against Texaco's Gathering System in the total sum of $4,627.00 together with ten percent attorney's fees, and legal interest at five percent per annum from November 13, 1962 until paid, plus costs.

### F. E. N. DESPAUX

Despaux counterclaimed against Texaco, Continental and Offshore in the respective interpleaders on November 13, 1962. He did not file liens.

Despaux claims $904.41; $780.00 for rental of crewboat and $124.41 for repair to crewboat.

#### 1. *Oil Well Act*

Under the Oil Well Act he is entitled to a judgment recognizing his lien in the amount of $780.00, plus interest from November 13, 1962, plus ten percent attorney's fees.

#### 2. *Private Works Act*

Since no lien was recorded, Despaux is not entitled to recover against Texaco, but since the claim in the amount of $780.00 is cognizable under the Private Works Act, he is entitled to judgment against Continental in that amount, plus interest from November 13, 1962.

### G. C. L. DILL CO., INC.

Dill counterclaimed and/or cross-claimed against Offshore, Continental and Texaco.

Dill contracted to provide manned construction equipment to Offshore, *i. e.*, a dragline mounted on a spud-barge with operator and oiler aboard, and tugboat with pilot to tow it around the job. The invoice showed charges billed for the amount of time the equipment was in use at agreed hourly rates and that the equipment worked as directed. Dill had no supervisory employee working with its equipment. Liens were recorded July 19, 1962.

#### 1. *Oil Well Act*

██ Dill is entitled to a judgment recognizing its lien under the Oil Well Act in the amount of $23,209.38, plus ten percent attorney's fees, plus interest from November 13, 1962.

#### 2. *Private Works Act*

Dill would not be a subcontractor under the Private Works Act. Dill was a furnisher of manned equipment. He is therefore entitled to a judgment against Texaco and Continental in the amount of $23,209.38, plus interest from November 13, 1962.

### H. ELLZEY MARINE SUPPLIES

Ellzey intervened in both interpleaders on November 14, 1962. He did not file a lien.

Ellzey sold a myriad of miscellaneous marine supplies to Offshore over the counter at its store in Venice, Louisiana, some of which were within the scope of the lien laws and some of which were not. Moreover, Ellzey satisfactorily proved that some of his merchandise was used on the Texaco job but such proof was insufficient with respect to many items. On balance I hold that he is entitled to twenty-five percent of his claims. He is entitled to a judgment recognizing his lien in the amount of twenty-five percent of his claim, plus interest from November 14, 1962 under the Oil Well Act, and is entitled to a judgment in his favor and against Texaco and Continental in the same amount, plus interest under the Private Works Act.

### I. EMPIRE MACHINE WORKS, INC.

Empire proved that a total of $413.13 worth of materials actually were de-

livered to and used on the Texaco job #129. It is therefore entitled to a judgment recognizing its lien and privilege pursuant to the Oil Well Act and against plaintiff Texaco's Gathering System in the amount of $413.13, plus ten percent attorney's fees, plus legal interest at five percent from November 30, 1962 until paid.

## J. FOODS AND SERVICES, INC.

Foods and Services engages in a business known in the petroleum trade as *catering*. The great majority of this catering is performed in remote areas, particularly the Gulf of Mexico, for concerns which operate in such locations, usually in the exploration or drilling for, or production or gathering of, petroleum resources.

Mr. Autin, president of Foods and Services, described his firm's operations: Upon a customer's request, Foods and Services determines the nature of the customer's activity and estimates his catering requirements. At its expense, Foods and Services obtains the necessary food and other supplies and has them delivered to the work site and stocked there. Crews of Foods and Services' employees accompany the food and supplies and remain on the work site for protracted periods of time to perform the catering.

Once at the work site, Foods and Services provides, and its personnel prepare and serve, all food, including condiments, and all drink (except fresh water) consumed at the work site. Foods and Services uses its own kitchen utensils to prepare the meals, and serves the meals on its own tableware.

Foods and Services personnel clean the galley, dining room, and other living areas at the work site, using Foods and Services' own sanitary supplies, such as soap, cleanser and wax, and cleaning equipment, such as brooms, mops, electric waxers and buffers, buckets, rags and brushes. Foods and Services provides sheets, pillows, pillowcases and blankets, which its personnel make up on the beds daily and have laundered periodically.

On November 16, 1961, Offshore Gathering Corporation engaged Foods and Services to cater the barge *Magic*, which was used to lay a major portion of the pipeline. Mr. Autin executed the written catering contract, introduced into evidence, on behalf of Foods and Services and in his capacity as president, and Mr. Lester executed that contract on behalf of Offshore Gathering. Both Mr. Lester and Mr. Autin testified that the catering of the *Magic* was the only work Foods and Services ever did for Offshore Gathering. Mr. Lester and Leslie H. Ott, Captain of the *Magic*, both testified that no one other than Foods and Services catered the *Magic* while it was under charter to Offshore Gathering.

According to the evidence Foods and Services, personnel began catering the *Magic* when it left Morgan City some time in November 1961. Nathan Arceneaux, Captain of the tug *Ted*, testified that his vessel picked up the *Magic* near Morgan City in mid-November. Mr. Autin fixed the actual date of commencement as November 16, 1961.

Mr. Autin identified monthly invoices to Offshore, the purchase order, and the accounts receivable ledger, all of which were introduced into evidence. These records, together with the oral testimony, established that Foods and Services catered the *Magic* continuously from November 16, 1961 until March 4, 1962.

The rate of compensation from the catering was fixed by Paragraph X of the contract. The invoices show the daily bases for computation of the compensation. On some occasions, Foods and Services charged less than the agreed rate as an accommodation to Offshore Gathering (e. g., $2/3$ rate, $3/4$ rate, $1/2$ rate), for which Foods and Services does not claim any adjustment upward.

The balance shown on the accounts receivable ledger as due by Offshore Gathering, is $21,021.46. Mr. Autin testified that all charges on the invoices

and ledgers were for catering the *Magic*. Foods and Services claims only $20,021.46. The difference of $1,000.00 is due to the fact that Foods and Services, asserting a maritime lien against the *Magic*, had it seized. Its owners paid Foods and Services $1,000.00 to release the lien, which sum Foods and Services has credited to Offshore Gathering's account. Mr. Autin testified that no sums other than that $1,000.00 have been paid by anyone on Offshore Gathering's account.

Throughout the period during which Foods and Services catered it, the *Magic* was under charter to Offshore Gathering, as was established by the testimony of Captain Ott, Mr. Lester, and Mr. Colby. Offshore Gathering chartered the *Magic*, according to the testimony of those witnesses, for use in installing portions of the South Pass Gathering System which Offshore Gathering had contracted with Texaco to build.

To secure payment of the balance of $21,021.46 then due for the catering services, Foods and Services prepared an affidavit of lien and timely recorded it on August 24, 1962.

On October 31, 1962, Foods and Services filed an answer and counterclaim in the Texaco interpleader. On September 4, 1964, Foods and Services filed an answer and counterclaim in the Continental interpleader.

Counsel for Texaco and Continental stipulated in open court with counsel for Foods and Services that Offshore exploration, drilling, production and gathering would not be possible unless the operating personnel were lodged and fed in the field, and that in that connection it was necessary for food to be supplied to and prepared on the work site, and for the living quarters to be kept in a clean and livable condition.

No sales or other tax was directly charged by Foods and Services to Offshore Gathering.

Foods and Services has borne its burden of proving the contract, the performance, and the balance due.

There will be judgment as prayed for on the cross-claim in favor of Foods and Services and against Offshore Gathering in the sum of $20,021.46, together with interest and costs.

### 1. *Oil Well Act*

██ To be favored by a lien under the Oil Well Act, Foods and Services must show that catering constitutes labor, services, equipment, material or supplies within the context of La.R.S. 9:4861.

The catering contract itself provides some insight into the matter. Paragraph I refers to "food and housekeeping service," "food supplies," and "sanitary supplies." Paragraphs III, IV, and VIII refer to "supplies" and to "services." The last page of the contract is a list of "equipment furnished the *Magic* by contractor." This is an agreement, couched in the terms of the trade, entered into by parties not contemplating litigation. It is evidence of the manner in which its terms are used in the trade and in this particular agreement. It is persuasive that catering includes several of the activities listed in La.R.S. 9:4861.

Whether the Oil Well Act affords a lien for catering is *res nova*. The jurisprudence of Louisiana and of other jurisdictions suggests an affirmative conclusion.

The Louisiana Supreme Court has held that the term *service*, as used in La.R.S. 9:4861, includes cleaning out an oil well because cleaning "constitutes necessary labor." Altom v. Mt. Vernon Oil & Gas Co., 174 La. 775, 141 So. 457 (1932). Counsel for Texaco and Continental Casualty have stipulated that cleaning the galley and living quarters of the crew is likewise necessary. In light of the fact that any requirement of incorporation has been excluded from La.R.S. 9:4861, cleaning the well is analogous to cleaning the galley and quarters of the crew. If the former is lienable as "necessary labor," then so is the latter.

The only case interpreting the word material as used in La.R.S. 9:4861 is Sargent v. Freeman, 204 La. 997, 16 So.

2d 737 (1944), in which a generator used on a drilling rig was held to be "material."

The courts of Louisiana have not had occasion to define fully labor, services, material, supplies and equipment under La.R.S. 9:4861. To the extent that they have not, we may examine constructions by domestic and foreign courts of similarly worded statutes. State courts have done this on occasion. Southern Gas Line v. Dixie Oil Co., 16 La.App. 26, 133 So. 181 (1931); Hughes v. Will, 35 So.2d 241 (La.App.1948). Both of these cases involved claims under the Private Works Act, but in both the court analogized to cases decided under the Public Works Act. The Louisiana Supreme Court has on occasion based a decision on interpretations by foreign courts of foreign lien statutes. Red River Const. Co. v. Pierce Petroleum Corp., 165 La. 565, 115 So. 752 (1928). We look to foreign cases here because the answer is not contained in any Louisiana cases.

No Louisiana cases exist which define the word equipment as it appears in La.R.S. 9:4861, but a definition of equipment as contradistinguished from material appears in Sandel & Lastrapes v. City of Shreveport, 129 So.2d 620 (La.App.1961). Equipment is defined as the "outfit necessary to enable contractor to perform the agreed services." Applied to La.R.S. 9:4861, this definition of equipment can reasonably be held to include the pots, pans, plates, glasses, silverware, linen, towels, buffers, brooms, brushes, and mops, which Foods and Services uses in its operation.

Act 195 of 1912, a predecessor to the present La.R.S. 9:4621, read as follows:

Any person or persons furnishing supplies, provisions, or money, in deadening, felling, cutting, hauling, barking, driving, running, rafting or booming any log or timber, for the purpose of manufacturing telephone, telegraph poles, and cross ties, or any of them, or in manufacturing telephone, telegraph poles, or cross ties, shall have a lien and privilege on same.

The question was whether groceries furnished to the logging site and consumed by those working there were supplies furnished in deadening, etc., so as to give rise to a lien under the statute. The court held that they were.

We conclude, therefore, that the groceries in question were used in the manufacture of the ties, seized. * * The labor in cooking the meals was a very essential service to perform in the manufacturing of the ties, we must say. Cox v. Crow, 18 La.App. 380, 137 So. 605 (La.App.1931).

Courts of other jurisdictions, interpreting similarly worded lien statutes, have granted liens for such services as cooking, Cascaden v. Wimbish, 161 F. 241 (9th Cir. 1908); Winslow v. Urquhart, 39 Wis. 261 (1875); Young v. French, 35 Wis. 111 (1874) (dictum), furnishing and trucking groceries, Brogan v. National Sur. Co., 246 U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703 (1918); National Sur. Co. v. Arizona Grocery Co., 32 Ariz. 399, 259 P. 404 (1927); Mitchell v. McCutcheon, 33 N.M. 78, 260 P. 1086 (1927), and caretaking, Fremming v. Southern Alaska Min. Co., 8 Alaska 309 (1931). All of these are analogous to one or more of the operations included in catering.

The terms interpreted in each of the cited cases are similar in one or more particulars with the operative terms of La.R.S. 9:4861. Catering involves two related aspects: housekeeping and victualing. The cited cases held both aspects to deserve lien protection. The test generally applied is whether the services, etc., are *necessary* to accomplish the common purpose. Winslow v. Urquhart, *supra*. Texaco and Continental stipulated that it was. Other courts use other phraseology e. g., "indispensable to the consummation of the particular work," L. P. Stephens, Inc. v. Kellog Lumber Co., 18 La.App. 507, 137 So. 769 (1931); "indispensable to the prosecution of the work," Brogan v. National Sur. Co., *supra*; "necessary labor," Al-

tom v. Mount Vernon Gas Co., *supra*; "essential to the combined * * * operation," Mitchell v. McCutcheon, *supra*; "essential service," Cox v. Crow, *supra*.

Therefore Foods and Services has performed labor and services, and furnished equipment, material and supplies in the operation and in connection with the operation of oil and gas wells, and is consequently entitled to a lien under La.R.S. 9:4861.

Accordingly, Foods and Services is entitled to a judgment recognizing its lien under the Oil Well Act in the amount of $20,021.46, plus ten percent attorney's fee, plus interest from October 31, 1962.

### 2. *Private Works Act*

Foods and Services is not entitled to a lien against Texaco's property or to personal judgment against Texaco under the Private Works Act because it did not record its affidavit of lien within sixty days as required by that Act.

A claimant under the Private Works Act must sue the surety within one year after recording his affidavit of lien in order to preserve his personal right of action against the surety. However, more than a year intervened between the date Foods and Services filed its lien and the date that Foods and Services answered and counterclaimed in the Continental interpleader. Therefore, Foods and Services is not entitled to a judgment against Continental under the Private Works Act.

### K. GLASER CONSTRUCTION CO., INC.

Glaser counterclaimed against Texaco and Continental in the respective interpleaders on December 4, 1962. It recorded its lien on June 27, 1962 and reinscribed each year thereafter.

I find that Glaser was a subcontractor to Offshore within the definition previously set forth in that it not only supplied the men and equipment but that they performed the actual construction work of laying pipe under their own

supervision without any supervision from Offshore. This is true despite certain letters Glaser wrote to Offshore using the word "rental" rather freely and suggesting to Offshore that the work would be done under Offshore's supervision.

### 1. *Oil Well Act*

Under the Oil Well Act Glaser is entitled to a judgment recognizing its lien in the amount of $15,756.75, plus ten percent attorney's fees, plus interest from December 4, 1962.

### 2. *Private Works Act*

Glaser is also entitled to a judgment against Texaco and Continental personally under the Private Works Act in the amount of $15,756.75, plus interest, and to a privilege against Texaco's property under the Private Works Act. Judgment will also be given Glaser against Offshore.

### L. HAEUSER BOAT RENTAL

Haeuser intervened in Texaco interpleader on May 1, 1968 and did not intervene in Continental interpleader. He filed no liens.

Haeuser proved it rented a crewboat to Offshore for use on the Texaco job. It claims $714.60, $129.60 of which was for repairs. It cannot recover under the Private Works Act but is entitled to judgment recognizing its lien in the amount of $585.00 plus interest from May 1, 1968, plus ten percent attorney's fee under the Oil Well Act.

### M. INDUSTRIAL WELDING SUPPLY CO., INC.

Industrial intervened in both interpleaders on November 15, 1962. It did not file liens.

Industrial claims it supplied welding equipment and expendable welding supplies (oxygen, acetylene, etc.) to Offshore. It did not prove that its entire claim of $1812.28 was actually used on Offshore's Texaco job. It is, therefore, only entitled to a privilege under the Oil

Well Act for the total amount of the Job 129 invoices. It may not recover under the Private Works Act since there was no recordation. It is entitled to a judgment against Continental in the same amount since their supplies were consumed on the Texaco job.

## N. THOMAS JORDAN, INC.

Jordan did not file a lien. It did intervene and counterclaimed against Texaco in its interpleader on October 31, 1962. It makes no claim against Texaco or Continental under the Private Works Act.

This claim is based on rentals of marine construction equipment, viz: five "dubm" barges (the "310", the "381", the "382", the "387", and the "393)." The rental of each was covered by a separate charter between Jordan and Offshore.

The amount of such rentals can be determined from the invoices and other evidence introduced at the trial. Offshore had a system whereby each invoice which it received from Jordan was checked to determine where the barges had been used. When a barge was used on the Texaco job, this information was relayed by telephone to Offshore's accounting department in Port Lavaca, Texas, and the notation "Job 129", or an accounting number prefixed by "OG–8", or both, were written on the invoices. Where a barge was used on two jobs, Offshore allocated part of the rental to each job, on the basis of the number of days the barge was used on each job.

I have examined the evidence presented, and have determined that Jordan barge rentals for the Texaco job totaled $24,509.10. This figure includes two percent Louisiana sales tax, which I hold is properly included in Jordan's claim, but it excludes all rentals after May 28, 1962, which was the date on which the construction was completed.

Offshore's records show that prior to January 31, 1963 Offshore made three payments to Jordan in the amounts of $5,000.00, $540.00 and $2,500.00. Jordan concedes that the $5,000.00 payment must be credited against the amounts due on account of the Texaco job. On the other hand, Texaco and Continental concede that the $540.00 payment cannot be credited against the amounts due on account of the Texaco job.

The method of imputing the $2,500.00 payment is disputed by the parties. Jordan points to the fact that the debtor's own books show that this payment was intended by Offshore to apply to the costs of other jobs. Articles 2163 et seq. of the Louisiana Civil Code give the debtor the right to declare which debt he intends to pay, and Texaco and Continental point to the fact that Offshore did not declare its intentions to Jordan at the time it made the payment. I am of the opinion that to require that a debtor declare which debt he intends to discharge would be a useless formality in those rare cases in which the creditor does not contest the debtor's imputation. This is one of those cases.

When the debtor and the creditor are at odds, the law limits the debtor by requiring him to make his declaration at the time of payment. But there is no reason for so limiting the debtor when the creditor agrees with him. To require a debtor to make a formal declaration of what he intends to do, when the creditor does not question the propriety of his intentions, places too much emphasis on form. The only question to be resolved in such a case is what the debtor intended.

Continental and Texaco are third parties insofar as Jordan and Offshore are concerned. They cannot control, or alter the imputation that the debtor has elected to make. Grand Lodge Benevolent Knights v. Murphy Construction Company, *supra;* William B. Thompson Co. v. Sporl, *supra;* Robson & Allen v. McKoin, *supra.*

Therefore, I hold that the $2,500.00 payment should not be credited against the amounts due for barge rentals incurred by Offshore in the construction of Texaco's gathering system. Therefore, as of January 31, 1963, the amount

**1232**

owed by Offshore for such rentals was $24,509.10, less $5,000.00, or $19,509.10.

On March 25, 1963, Offshore gave Thomas Jordan its promissory note in the amount of $7,187.99. This note bore six percent interest, but the barge rental contracts also provided for six percent interest. The parties did not intend to novate the existing indebtedness and, in the absence of such intent, novation did not take place. See Pontchartrain Apartments, Inc. v. Maryland Casualty Company, 171 La. 67, 129 So. 671 (1930); Wilson v. Clerk of Court, 148 So.2d 775 (La.App.1963); Sterlington Bank v. Terzia Lumber & Hardware, Inc., 146 So.2d 233 (La.App.1962). Neither did the note constitute "payment," as contended by Texaco and Continental, since it was merely a promise to pay.

Subsequently, Offshore made six payments on said note, totalling $3,788.64. Of this amount, $161.70 is separately stated as, and must be imputed to, interest. The remaining balance of $3,623.94 should be imputed to the Jordan barge rentals on the Texaco job, since there is no evidence that Offshore had any particular intentions with respect to imputation of such payments. Thus the total amount of unpaid barge rentals due on account of the Texaco job is $15,940.41.

In addition to its lien rights, Jordan is entitled to recover from Texaco because of Texaco's independent promise to pay, which was discussed above. At the time the promise was made, Offshore owed Jordan $19,280.75. Jordan was demanding payment in full, or release of its barges. Texaco assured Jordan that it would receive $19,280.75. Jordan is entitled to judgment against Texaco in that amount.

Therefore, the court holds that Jordan is entitled to a judgment against Texaco in the amount of $19,280.75, plus interest from and after October 31, 1962. Of this amount, $15,940.41, plus ten percent attorney's fees and interest from October 31, 1962, is secured by a lien against Texaco's property, under the Oil Well Act.

### O. JUPITER CORPORATION
### (Commonwealth. Oil Co. Division)

Commonwealth sued Offshore, Texaco and Continental on September 26, 1962 in both State and Federal courts, and counterclaimed against Texaco and Continental in the respective interpleaders. It filed a lien on May 31, 1962.

This claim is for the rental of one piece of unmanned equipment, the pipe-laying barge *Magic*. The barge was manned and supervised by Offshore employees except for the Captain. The *Magic* worked on the Offshore job for about four months for which Commonwealth charged $108,345.66. There was another charge of $562.99 which made a total of $108,908.65. There is no doubt that the pipe-laying barge *Magic* was used on the Texaco Gas Gathering project for the time claimed. One payment by Offshore of $9,378.00 left $99,522.45 due and owing to Commonwealth by Offshore.

#### 1. *Oil Well Act*

Commonwealth is entitled to a judgment recognizing its lien under the Oil Well Act in the amount of $99,522.45, plus ten percent attorney's fees, plus interest from September 26, 1962.

#### 2. *Private Works Act*

Since this was rental of unmanned equipment, it is not a claim cognizable under the Private Works Act.

Commonwealth is also entitled to judgment against Offshore in the amount of $99,522.45 plus interest from date of judicial demand.

#### P. O.S. JUSTIS, d/b/a Globe Equipment Co.

Justis counterclaimed against Texaco and Continental on December 10, 1962 in the respective interpleaders. Justis filed liens on August 22, 1962.

This claim is for the rental of a large piece of construction equipment, viz: a crawler crane with attached accessories.

### 1. *Oil Well Act*

Justis is entitled to a judgment under the Oil Well Act recognizing his lien in the amount of $6,460.00, plus ten percent attorney's fees, plus interest from December 10, 1962.

### 2. *Private Works Act*

The amount claimed is $6,460.00. Since Justis was late in filing his lien under the Private Works Act, and since this was rental of unmanned equipment, he is not entitled to a lien or judgment against Texaco or Continental under that Act.

### Q. JOHN R. LAMBERT, JR.

Lambert counterclaimed against Texaco and Continental on November 14, 1962 in the respective interpleaders. He filed his lien on August 10, 1962.

Lambert's claim arises out of the rental of one piece of construction equipment, a combination dragline and clamshell bucket. It was rented, manned with an operator aboard.

### 1. *Oil Well Act*

Lambert is entitled to a judgment recognizing his lien under the Oil Well Act in the amount of $2,457.80, minus the sum billed for February 1962, plus interest from November 14, 1962, plus ten percent attorney's fees.

### 2. *Private Works Act*

Lambert may not recover against Texaco or Continental under the Private Works Act. His suit against Texaco fails because he did not timely file his lien. He may not recover against Continental because his work was not covered by that Act. Lambert did not supply manned equipment because Mr. Terrell, the employee involved, was paid by and was an employee of Offshore and not Lambert.

### R. TASSIN MARSH EQUIPMENT CO.

Tassin counterclaimed against Texaco and Continental on November 30, 1962 in the respective interpleaders. He filed liens on July 5, 1962. Tassin filed suit in State Court against Offshore on September 18, 1962.

Tassin's claim is for rental of manned construction equipment (manned marsh buggy and dragline, plus accessories like jute-driver leads, etc.) Offshore used the equipment in digging trenches in the marsh, pulling pipe along the line, and later back filling the trenches after the line was laid. The manned equipment was under Offshore's supervision.

Tassin proved that its equipment was used on the gas gathering job of Texaco.

### 1. *Oil Well Act*

Tassin is entitled to a judgment recognizing its lien under the Oil Well Act in the amount of $6,257.00, plus interest from November 30, 1962, plus ten percent attorney's fee.

### 2. *Private Works Act*

Tassin is also entitled to a judgment against Texaco and Continental in the amount of $6,257.00 under the Private Works Act with interest from November 30, 1962.

He is also entitled to judgment against Offshore in the claimed amount.

### S. UNITED TUGS, INC.

United Tugs sued Continental, Texaco and Offshore in State Court on August 8, 1962. This suit was removed to this Court on August 24, 1962. United intervened in the Continental and Texaco interpleaders on December 3, 1962. Timely liens were filed April 3, and June 11, 1962.

Tugboats with crews and necessary accessories aboard were furnished to Offshore by United for towing and miscellaneous related services used by Offshore in performing its construction work on the Texaco pipeline job. Off-

shore and United Tugs entered into three separate written charter agreements, one each for the hire of three tugboats, viz: the *Alamo*, the *Alamo II*, and the *Cat & Mitch,* and oral agreements for the hire of two other tugboats, the *Ted* and the *Karen D.* Those agreements fix the rental rates and provide other terms and conditions for both parties in connection with the leasing and use of the tugboats. Texaco and Continental do not seriously contest United's claim that the tugs were used on Texaco's gas gathering job. They do contest a portion of the amount claimed on the ground that it was not costs that were directly related to the Offshore-Texaco job.

Texaco and Continental seriously dispute portions of United's claim. United's claims are based on total charges of $88,743.50, billed to Offshore on 21 invoices, less two payments of $5,000.00 each, which were made by Offshore, for a net unpaid balance of $78,743.50.

United protests the use of these invoices claiming they were not properly in evidence. I hold that they are in evidence and may be considered by the court in fixing the total of United's claim.

Three invoices must be stricken from the claim because they are for fuel and rope, all of which was to be supplied by United Tugs under the contract of hire. These were for $125.71, $39.41 and $290.88.

Texaco urged that certain trips made by a tug or tugs be stricken because they were not made in connection with the construction project (Invoices #2034, #2047, #2105 and #2108). All these contentions by Texaco are rejected.

Texaco's attempt to impute payment to United for $2,389.51 to the Texaco job is also rejected. Offshore imputed the payment to Job #137 which was the Geismar project.

The parties agree that the sum of $220.54 (Invoice #2138) should be stricken from the claim.

All other claims for deductions by Texaco are rejected.

United Tugs' lien and judgments will be for the amount of $78,066.96.

### 1. *Oil Well Act*

 United Tugs' work was clearly covered by the Oil Well Act and is entitled to a judgment recognizing its lien in the amount stated above, plus interest from August 8, 1962, plus ten percent attorney's fees.

### 2. *Private Works Act*

Applying my definition of subcontractor, the court finds that United Tugs was a subcontractor and not a renter of movable property and is therefore covered by the Private Works Act. Therefore, United is entitled to a judgment against Texaco and Continental under the Private Works Act in the amount set forth above, plus interest from August 8, 1962.

As I have already held, another ground upon which United is entitled to recover against Texaco is Texaco's independent promise to United to pay the amount owed by Offshore.

### MARSHALLING ASSETS

It is recognized that the aggregate amount in which the various claimants are entitled to judgments against Continental exceeds Continental's total liability under its bond, *viz.* $147,334.00. However, this fact is of no practical significance since those claimants which are entitled to judgments against Continental also are entitled to judgments against Texaco, *in personam,* and/or are entitled to liens against Texaco's property under the Oil Well Act, which will enable all claimants to realize full recovery of their judgments.

Texaco is entitled to retain the contract funds it withheld from Offshore, which I have held total $193,003.05, to the extent of its liability to the various claimants herein, including the liens against its property, and, accordingly, is entitled to a judgment against Offshore in such amount.

Counsel for each party entitled to a lien or to recover money will prepare judgment and submit for the Court's approval. Counsel for Texaco and Continental will prepare judgments in cases in which they prevailed.