ST. PAUL, J.
 

 This is a suit on a promissory note, brought by the payee against the makers and indorsers thereof. The note is in form as follows:
 

 $3,000. New Orleans, May 25, 1916.
 

 Six months after date I, we, or either of us, promise to pay to the order of W. B. Thompson & Co., at their office in New Orleans, La.,
 
 three thousand dollars,
 
 for value received, with interest at the rate of 8 per cent, per annum from date until paid. And I, we, or either of us, further agree to pay 10 per cent, additional on principal and interest as attorney’s fees in case- this note is placed in the hand of an attorney for collection. (Due Nov. 25/16.)
 

 [Signed] J. A. Sporl.
 

 Indorsed: P. Larroux. Geo. Y. Fuchs.
 

 On the same day the note is dated, Larroux and Fuchs, the indorsers, each gave to the payee thereof the following
 
 waiver,
 
 to wit:
 

 I hereby waive demand, protest and notice of protest, on note for $3,000, dated May 25, 1916, due 6 months after date, payable to the order of W. B. Thompson & Co., with 8 per cent, interest from date, signed by J. A. Sporl and indorsed by me.
 

 The issues are thus stated and disposed of by the district judge, to wit:
 

 I.
 

 Opinion of the District Judge.
 

 Cage, J. W. B. Thompson & Co. are commission merchants, engaged in the business of dealing in cotton and other produce on commission. According to the usual course of this business, their patrons begin (do) business with them by opening a running account on their books. These open accounts run along for years, and all moneys advanced by the commission merchants are charged against the planters (or other patrons) and the proceeds of the sale of cotton and other produce sent to the commission merchant for sale are credited on the open accounts.
 

 Joseph A. Sporl was conducting in the city of New Orleans what is known as a cotton pickery, and in the course of his business he Would purchase damaged, and partially burned, and sound cotton, and would separate and condition it,"and consign it to. W. B. Thompson & Co. for sale. Thompson & Co. would advance him money from time to time for the purchase of damaged cotton, and to enable him to carry on the operation of conditioning and preparing it for sale.
 

 That had been going on between Thompson & Co. as commission merchants, and Sporl as patron and customer, for several years. And on a certain occasion in May, 1916, when Sporl applied for further advances of money for the purposes just stated, Thompson & Co. informed him that his credit in the shape of cotton on hand did not justify them in making him the advance which he desired, namely, $3,000; but told him that if he would procure two responsible sureties, in the form of his (Spoil’s) note, indorsed by them (the two responsible sureties), that Thompson & Co. would advance him the $3,000 on open account; this security to stand in the same way as if stock or bonds, or promissory note, secured or unsecured, had been deposited with Thompson
 
 &
 
 Co. as security for the final balance on open account.
 

 Sporl went to two of his friends, Pierre Larroux and George Y. Fuchs, and asked them for their accommodation indorsement, in order to enable him (to obtain money or credit) to carry on his business. (Accordingly) a note tor $3,000 was drawn and subscribed by Sporl and indorsed by Larroux and Fuchs, they lending him their credit to do with as he saw fit. He (Sporl) thereupon took the note and deposited it with Thompson & Co., who received it, under the terms of their understanding with Sporl, as security for the (balance which
 
 *355
 
 might eventually be due;, on) settlement of the open account running between them.
 

 This open account ran on (thereafter) for several years, Thompson & Oo. holding the note (as security) as aforesaid; and at intervals sending Sporl statements of the (open) account between them; (said statements) showing in every instance a balance due (in favor of) Thompson & Co., and never a balance due (in favor of) Sporl.
 

 In each instance where the account showed the balance to be in favor of Thompson & Co., the notation was made (on the statement sent to Sporl) that it was secured by the note which I have described above.
 

 (Meanwhile) both Larroux and Fuchs died, and their successions were duly opened, one being represented (and administered) by a tutrix, and the other by an executor; and finally when the account showed a very large sum, to wit, between $30,000 and $50,000 (that is, $50,848.23, less 129 bales of cotton to be sold and accounted for by Thompson & Co.), the latter brought suit on the note against Sporl and the successions of the two indorsers. . They (the tutrix and executor, aforesaid) pleaded in answer that they know nothing of the note; but that some agreement must have been entered into between Thompson & Co., and Sporl, whereby the note was discharged, but the nature of which they do not know.
 

 On the trial of the case they (the tutrix and the executor) attempted to prove payment, by imputing as payment (on the note the credits appearing on the statement of the open account sent to Sporl).
 

 In my opinion, their attempt (not authorized by their answers) completely failed. As a matter of fact, there never have been any (cash) payments made by Sporl to Thompson & Co. There existed, as I said, between these two parties, a running open account, and all that was ever done during this course of years was to charge that account with money advanced, and credit it with the proceeds of sale of consigned (cotton and) produce; and by tacit, and implicit if not expressed, agreement and contract, well understood, all credits becoming due to Sporl should be credited to the open account; and there never was any intention on the part of either that any of those credits should be applied to the payment and discharge of the note.
 

 The note remained there (i. e., with Thompson & Co.) as it was originally placed, to secure any balance that might be due on the open account at any time the parties saw fit to close it and strike a final balance thereon.
 

 This balance was struck as I have said, and showed Sporl indebted to Thompson & Co. in the sum of, approximately, $50,000 (i. e., $50,-848.13, when this suit was filed, less the proceeds of 129 bales of cotton to be accounted for).
 

 Sporl, who knew the facts, made no appearance or answer whatever (but as a witness on behalf of defendants, and the only witness called in the case, he testified to the facts as set forth above). * * *
 

 In my opinion, the defense has totally failed. Thompson & - Co. are entitled to judgment as prayed for, and it is so ordered.
 

 II.
 

 The able trial judge has fallen into error, immaterial however, when he says that “there never have been any (cash) payments made by Sporl to Thompson & Co.” For the account shows that in the fall of 1919, and thereabout, when the balance against Sporl was hovering around $55,000, he paid Thompson & Co. seven checks aggregating $22,-073.28, not including two checks aggregating $664.10, which were returned unpaid and charged back to his account.
 

 But the trial judge is quite correct when he says that, “by tacit, and
 
 implicit
 
 if not expressed, agreement and contract, well understood, all credits becoming due to Sporl should be (and were) credited to the open account ; and there never was any intention on the part of either that any of those credits should be applied to the payment and discharge of the note (held as security for the balance due on open account).”
 

 For Mr. Sporl testifies very clearly, though reluctantly and in a hesitating way, that no credit or payment ever was imputed, or expected to he imputed, on the note, thus:
 

 It (the note) was let run on, as we had an open account, and we kept doing business right along; and they had that waiver of protest.
 

 Question; Did they ever
 
 credit you
 
 with this amount? Answer: No,
 
 they charged it to me.
 
 (See the account filed;
 
 debit
 
 item of May 25, 1916.)
 

 Question: Did they ever render ypu a statement showing a charge of this $3,000? Answer: Xes. * * *
 

 
 *357
 
 Question: Did Mr. Thompson ever get the consent of these two gentlemen (Larroux and Fuchs) to carry that note as collateral security for the other advances made to you? Answer: Not that I know of; he considered “protest waived” covered that point. * * *
 

 Question: Did you at any time offer to pay any specific amount on that note? Answer: No, sir; because it was a running account.
 

 Question: There never was any request by you that any amount be imputed to the payment of that specific note, was there? Answer: No, sir; because I never expected my indorsers to pay. * * *
 

 Question: Did either of your indorsers ask you whether this note had been paid? Answer: I don’t think any of them asked that. It may have been mentioned some time, and I told them it was somewhat reduced.
 

 Question: You told them that the note was reduced? Answer: I told them that the account I owed, instead of the note, fifteen or twenty thousand dollars (sic); I cannot say I paid directly anything on account of that note; I may have mentioned that to them. * * *
 

 Question: In other words, the note transaction and the open account were two separate matters? Answer: No, it was all charged to one account. * *
 

 Question: You knew, * * * and they (the indorsers) knew, that Thompson & Oo. held it (the note) up to the time of their deaths? Answer: Yes. * * *
 

 Question: They knew that? Answer: No,
 
 sir
 
 (sic). * * *
 

 Question: Do you mean to say that Mr. Larroux knew that Thompson & Co. were carrying this note as an asset against you, and that after it fell due Mr. Larroux (knew) that he was still liable? Answer: I don’t know whether Mr. Larroux knew it; but I suppose he would take it for granted, inasmuch as I did not return the note, that it was still open.
 

 There is not the least doubt that Sporl knew that the note was being carried by Thompson & Co. as security for the balance due by him on open account, and not as a separate item of indebtedness. For, in addition to the foregoing testimony, and the notation upon the statements furnished to Sporl, referred to by the district judge, we find in the record a letter from Thompson & Co. to Sporl, produced by Sporl in the original envelope in which it was mailed to him, dated August 17, 1918, reading as follows:
 

 We are inclosing statement of your account to 15th inst. showing due us on open account $4,665.97, with 26 bales on hand to be credited. We (are) holding note dated May 25/16, due Nov. 25/16, for $3,000, indorsed by P. Larroux and G. A. Fuchs, as security. You will please examine statement and report if correct.
 

 And as a corroboration of the foregoing, to wit, that the note was never intended to stand' as a separate item of indebtedness apart from the open account, but intended only as security for the balance on said open account, we observe that the “waiver of protest” by the indorsers was not contained in, and made part of, the note itself, but made by a
 
 separate
 
 though contemporaneous instrument. This, of course, does not affect, or add in any way to, the liability of the indorsers of the note; but it does show that the waiver was not merely perfunctory, but was
 
 deliberately
 
 considered before signing; and hence that the indorsers
 
 anticipated
 
 that the note might not be taken up promptly at maturity.
 

 But be that as it may, the fact remains that they did indorse a negotiable promissory note and give it to the drawer thereof for the purpose of enabling him to get credit thereon; and thus they put it mío
 
 Ms power
 
 either to discount it or to pledge it. And it remains a fact that he did not discount it, but did pledge it; and that it has not been paid.
 

 And even if we assume that the indorsers meant that the drawer should only discount the note and not pledge it, nevertheless Thompson & Qo. took the note in due course, without any knowledge whatever of the purpose for which the indorsers lent their credit, and
 
 certainly
 
 had no such knowledge of the facts “that his (their) action in taking the instrument amounted to
 
 bad faith.”
 
 Negotiable Instrument Law, Act 64 of 1904, § 56.
 

 In Snell et al. v. Union Sawmill Co. et al., 159 La. 608, 105 So. 729, we said emphatical
 
 *359
 
 ly:
 
 “Signatures to obligations are not mere ornaments,’’
 
 citing Boullt v. Sarpy, 30 La. Ann. 494, 495; and Baker v. Myatt, Dicks Motor Co., 12 Orleans App. 281; also, Murphy v. Russey, 117 La. 390, 399, 41 So. 692. And parties who sign negotiable instruments, or other solemn obligations, must expect to be held liable according to the tenor thereof.
 

 For the rest, we are not here dealing with a
 
 continuing guaranty,
 
 but with a negotiable instrument duly signed, indorsed, and delivered, and pledged (i. e. negotiated) by the holder thereof to a holder in due course, without knowledge of any equities or private understanding^ (if there were any) between the parties who bound themselves thereon; and the case is governed squarely by the principles announced in Bonart v. Rabito, 141 La. 970, 76 So. 166, and not by what was said about
 
 the intention of the parties
 
 in Continental Supply Co. v. Tucker-Rose Oil Co., 146 La. 671, 83 So. 892 (citing Menard v. Scudder, 7 La. Ann. 385, 56 Am. Dec. 610); although we see nothing in the latter case in conflict with the former or with our present holding. See, also, Hibernia Bank v. Succ. of Cancieane, 140 La. 969, 74 So. 267, L. R. A. 1917D, 402, and James v. Pike, Lakeyre & Co., 23 La. Ann. 477.
 

 As to the manner in which the credits have been imputed by Thompson
 
 &
 
 Co., the creditor, with the tacit (and even express) consent of Sporl, the debtor, we said in Grand Lodge, etc., v. Murphy Const. Co., 152 La. 123, 92 So. 757, that, “In general, and except where such imputation would amount to a fraud on the part of
 
 both
 
 debtor and creditor,
 
 the debtor
 
 may always impute the payments as he pleases; and cannot be controlled therein by a surety,” citing many authorities, including Robson & Allen v. McKoin, 18 La. Ann. 544, and R. C. C. art. 2163. And the imputation of payment made by the
 
 creditor
 
 with the express or tacit consent of the debtor is the same as an imputation of payment by the debtor himself. Cf. R. C. C. art. 2165. In re Gampagno, No. 7443, Court of Appeal, Orleans Parish, was decided under R. C. C. art. 2166, which has nothing to do with a case such as this, as was pointed cut in Grand Lodge v. Murphy Const. Co., supra.
 

 The judgment below was correct.
 

 Decree.
 

 The judgment appealed from is therefore affirmed.