This is a suit by plaintiff as the holder and owner for value and before maturity of a certain promissory note signed by the defendants, Robert D. Elston and Dudley C. Elston, to recover the face amount of the said note in the full sum of $2,500 with interest at the rate of 5% per annum from March 23, 1943, together with 10% upon said sum of principal and interest as attorney's fees, less, however, a credit of $922.63 paid by defendants on February 6, 1945. From a judgment in its favor in the amount of $671.77, with interest and attorney's fees, plaintiff has appealed.
The basis upon which this action is predicated and the burden of the defense are succinctly and ably stated by the learned trial judge in his opinion on the merits as follows:
"On March 23, 1943, the defendants executed and delivered to plaintiff through its loan agent for Bossier Parish, John H. Rachal, a promissory note for $2500.00, due March 25, 1944, identified with a chattel mortgage on Chickens. The loan was made to enable Robert D. Elston to increase his production of chickens and eggs, thus furthering the government's program to increase the production of food during the war.
"The note is unpaid, except for a credit of $922.63, which sum resulted from a liquidation *Page 565 
of the poultry project, and was paid and accepted without prejudice before the suit was filed.
"The defense to the suit is set forth fully in the answer. Briefly, it is that defendants understood when they executed the note that it was to be payable from the net proceeds of the poultry project, and that if the project failed to earn enough to pay the loan, there would be no personal liability on the part of defendants to pay the balance. Plaintiff was engaged in making loans to encourage more production of foodstuffs. Two types of loans were being made — one called F-1, on which the borrower was personally bound, and F-2, on which the personal liability was conditional."
The disposition of this appeal must rest purely and simply upon a determination of an issue of fact, namely, whether or not the defendants in good faith believed, and were justified in believing, that their execution of the note sued upon involved no personal liability on their part.
The conception of the negotiations which are involved in this case took place in the early part of the year 1943 during which time considerable publicity was being given to the efforts of the government to increase the production of foodstuffs during the war emergency period through the agency of plaintiff. It is definitely established that there were two types of loans contemplated by the government, which were distinguished as F-1 and F-2 loans. Under the provisions of bulletins and directives, which have been made a part of the record in this case, the details in connection with the distinction between these two types of loans are made explicit. F-1 loans, which involved personal liability on the part of the borrower, were designed, in accordance with the announced purpose of the program, "to provide adequate financing to assure maximum wartime production of essential agricultural commodities". F-2 loans, which provided only a contingent personal liability on the part of borrowers, were designed to aid and encourage the production of "essential war crops", which crops were specifically designated by name in the bulletins and directives relating to this character of loan.
The defendant, Robert D. Elston, at the time referred to, was engaged in the business of poultry raising in Bossier Parish. Interested by information as to the government's program in making advances for financing this nature of undertaking, young Elston made inquiry as to the details. In pursuit of this inquiry, accompanied by his father, the defendant Dudley C. Elston, one J.S. Pratt was contacted. At the time Pratt was the chairman of the Bossier Parish War Board, and it is primarily upon his testimony that the defendants rely in support of their defense in this case.
Pratt testified that he advised the Elstons that there would be no personal liability on a "chicken loan". The value of the testimony of this witness is considerably weakened by the fact that on cross-examination he testified to the effect that he knew there were two types of loans, and that he was reasonably familiar with the bulletins and regulations governing these loans. Despite these facts, Pratt testified that he thought the chickens would stand good for a loan of this nature, and that he thought he got the idea from one of the bulletins, but the witness could not identify any bulletin which would sustain this impression. He further testified that he talked to a representative of the plaintiff corporation, but he could not name nor identify the representative.
The sum and substance of the testimony of the Elstons and the witness Pratt is that all three were under the "impression" that the loan did not involve personal liability. The testimony of all three of these witnesses refers to Pratt's "understanding" and "interpretation" of the regulations governing the loan and the nature and extent of liability thereon.
We have no doubt that in the initial stages of this transaction defendants assumed they could borrow this money from the government agency without personal liability. But, opposed to the contentions of defendants that they remained under this impression, is the testimony of plaintiff's loan representative, John H. Rachal, its clerk, M.N. Wingett, and the Secretary-Treasurer of the Shreveport Credit Production Association and Parish representative of the plaintiff corporation, S.T. *Page 566 
Hamiter, all of whom state that they advised defendants of the distinction between F-1 and F-2 loans.
Obviously there is a sharp conflict of testimony on this point which our distinguished brother of the district court resolved in favor of defendants. With due regard to and respect for his reasons, we cannot agree with the conclusion reached and we believe our learned brother was led into error by his failure to accord serious consideration to other factors of evidence apart from the testimony of the witnesses in this case.
First, we call attention to the fact that the regulations governing F-2 loans specifically provide for personal liability for the full amount of the advances made, except in such instances as the County War Board might certify. These requirements, as definitely stated in the bulletin or directive governing F-2 loans, are set forth as being that:
"1. The borrower has used the amount advanced for producing the crops for the production of which the advance was made;
"2. The borrower in good faith has diligently applied principles of good husbandry to the production of such crops;
"3. The borrower has applied an amount equal to all proceeds of such crops to the repayment of the advance; and
"4. Such amount has been insufficient to repay the advance in full."
That these requirements were recognized by defendants is evidenced by the diligence with which distinguished counsel for defendants in his conduct of the examination of witnesses attempted to show full compliance therewith by the defendants.
The defendant, Robert D. Elston, was the party primarily at interest since the undertaking was his individual venture. However, since at the time of the negotiation of the loan the said named defendant was in class 1-A under Selective Service regulations and therefore subject to call, it was required by plaintiff's representatives that Dudley C. Elston, the father of defendant, Robert D. Elston, join in the execution of the note. We feel that this fact in itself is significant since such procedure would have been unnecessary and superfluous, if, as contended by defendants, they were uninformed as to any personal liability for repayment of the loan. This requirement is a circumstance which argues convincingly in support of the testimony of plaintiff's representatives to the effect that they acquainted defendants with facts and details as to their personal liability on this obligation.
The testimony and the evidence in the record conclusively establishes the fact that the borrowers in this case did not make any application of the proceeds from this poultry and egg producing venture to the repayment of the advance. The only credit on the obligation, to the extent of $922.63 made on February 6, 1945, represented the sum derived from the sale of chickens. To this amount, by the judgment of the district court, has been added an additional sum of $671.77, representing the cost of the building of a two-story chicken house and the purchase of a water pump, which expenditures were made by defendants out of the proceeds of the loan and which were retained by them.
In further evidence of the fact that defendants did not comply with the requirements above enumerated, which would have absolved them from personal liability, there was introduced on behalf of plaintiff upon trial of this cause the copy of a letter directed to Mr. R. D. Elston et al., under date of June 27, 1944, by one J.T. Coleman, Secretary of the Bossier USDA War Board, which letter we quote in extenso as follows:
"Benton, Louisiana June 27, 1944
Mr. R. D. Elston et al. McDade Louisiana Gentlemen:
The USDA War Board of Bossier Parish reviewed your 1943 F-1 loan on the date of June 22, 1944.
The Board decided to recommend to the RACC General Office that your note be extended from its due date until June 22, 1945, and they are also going to recommend you be allowed to retain the amount you submitted in your statement as 'Cash in *Page 567 
Bank' as of June 1, 1944, of $592.63 to be used by you to help defray expenses during low production season on account of high price of chicken feed.
They are requesting this loan be extended at this time, and that it be paid in full on or before June 23, 1945.
You should hear within a few days whether this recommendation being made by the War Board will be accepted by the General Office of the Regional Agricultural Credit Corporation.
Very truly yours,
J.T. Coleman Secretary, Bossier USDA War Board"
In our opinion the implications of the above communication are inescapable and amount to notice to defendants that payment of the obligation in full would be expected.
If, as contended by defendants, they were totally unaware of any obligation of personal liability, it is more than passing strange that the record in this case does not disclose any protest on their part. The failure of defendants to establish any objection on their part to this character of notification is weighty indication of the fact that they were not at the time relying upon freedom from personal liability.
It would be difficult to reconcile the conduct of reasonable business men, under the facts and circumstances of this case, with the conclusions reached by defendants. As was said by Judge Taliaferro in his opinion in Dealers' Finance Company, Inc., v. Woodward, La. App., 151 So. 145, 146:
"Signatures on promissory notes are not mere ornaments. They mean something and import some legal liability, or else they would not be required.
" 'And parties who sign negotiable instruments, or other solemn obligations, must expect to be held liable according to the tenor thereof'. Thompson Co. v. Sporl, 160 La. [352], 359, 107 So. 135, 138."
[1, 2] In this case the burden was clearly upon defendants to establish their defense, in which effort, in our opinion, they have utterly failed. On the contrary it appears evident to us that the question of the existence of personal liability vel non was not a controlling nor, indeed, even a pertinent influence in the negotiation of the loan by the defendants.
There is a great deal of testimony and evidence in the record of this case, as made up, with reference to the re-execution of the note and certain instruments in connection therewith on the part of defendants; mimeographed letters sent out by the Department of Agriculture and received by defendants, and other matters which we do not consider to be pertinent to a determination of the case, for which reason we have refrained from burdening this opinion with references thereto, preferring to strip from the record what we regard as the essential elements directly bearing upon a determination of the liability of these defendants.
For the reasons assigned the judgment appealed from is amended and recast to read as follows: "It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Regional Agricultural Credit Corporation of Washington, D.C., and against the defendants, Robert D. Elston and Dudley C. Elston, in solido, in the full sum of $2,500.00, with interest thereon at the rate of 5% per annum from date of March 23, 1943, until paid, and an additional 10% on both principal and interest as attorney's fees, subject, however, to a credit of $922.63 as of February 6, 1945, together with all costs of both courts."
KENNON, J., absent.
 On Application for Rehearing