436 So.2d 1185 (1983)
WHITNEY NATIONAL BANK OF NEW ORLEANS
v.
Vincent J. DERBES, Gary B. Brown, Herbert B. Christianson, Andrew M. Hegre and Lloyd D. O'Quinn.
Lloyd D. O'QUINN
v.
WHITNEY NATIONAL BANK OF NEW ORLEANS.
Nos. 12411, 12752.
Court of Appeal of Louisiana, Fourth Circuit.
June 3, 1983.
Rehearing Denied September 2, 1983.
Writ Denied November 18, 1983.
*1188 William J. Dutel, Laura J. Todaro, Dutel & Dutel, New Orleans, for Lloyd D. O'Quinn (co-defendant-appellant and plaintiff-appellee).
James G. Derbes, Derbes & Derbes, New Orleans, for Dr. Vincent J. Derbes, M.D. (defendant-appellant).
Bernard J. Capella, New Orleans, for Dr. Gary R. Brown, M.D. (defendant-appellant).
Arthur S. Mann, III, Tucker & Schonekas, New Orleans, for Dr. Herbert B. Christianson, M.D. (defendant-appellant).
Jerry A. Brown, John D. Wogan, Monroe & Lemann, New Orleans, for Whitney Nat. Bank of New Orleans (plaintiff-appellee and defendant-appellant).
Before SCHOTT, BARRY, AUGUSTINE, LOBRANO and WARD, JJ.
SCHOTT, Judge.
This is a consolidated case which began when an in commendam partnership, Elk Place Medical Plaza, borrowed money to finance construction of a building budgeted at $6,011,064. Coldwell Mortgage Trust provided $5,000,000 interim financing and Whitney National Bank of New Orleans loaned the balance represented by a promissory note for $1,011,064, dated July 12, 1973, payable on demand, with 8½% interest per annum and signed by the managing partner, Dr. George Farber. Farber, another general partner, Mrs. Alma Burks, and three limited partners, Drs. Derbes, Brown and Christianson indorsed the note as sureties. In 1975 Dr. Hegre and Lloyd D. O'Quinn purchased a limited partnership equity and also indorsed the note. In December, 1977, Mutual of New York provided $6,500,000 permanent funding which retired the $5,000,000 Coldwell loan and the $1,500,000 balance was applied to various other partnership obligations owed to Whitney. None of the MONY funds were applied to the subject note.
The partnership paid the interest on the note through January 31, 1979, and four months later went bankrupt. Whitney filed separate lawsuits against Dr. Farber and Mrs. Burks, and then filed suit (said suit hereinafter referred to as Whitney) against the other five limited partners as indorsers of the note. Numerous motions and exceptions were filed and the five defendants pleaded a variety of defenses, including material alteration of the note, impairment of subrogation rights due to release of securities, failure of consideration, failure of cause, error, fraud and misrepresentation. The matter was heard before a commissioner who made a report and recommendation to the district judge on July 31, 1980. Following a hearing on exceptions to the commissioner's report, on November 10, 1980, the trial judge rendered judgment in favor of Whitney for $1,011,064, the amount of the note, plus interest at 8½% and attorney fees. All reconventional demands were dismissed as of nonsuit. The five defendants devolutively appealed raising numerous issues and urging defenses. Whitney answered the appeal seeking additional interest.
Subsequently, Whitney obtained a writ of fieri facias against defendant O'Quinn. O'Quinn in turn sued Whitney (said suit hereinafter referred to as O'Quinn) for an accounting of funds the bank received after trial and was granted a temporary restraining order halting Whitney's collection efforts. The restraining order was vacated by this court; however, we denied Whitney's motion to stay O'Quinn's suit noting that a debtor has the right to seek injunctive relief "... if the judgment has been extinguished by payment made subsequent to the judgment."[1] Following the injunction *1189 trial, judgment was rendered in favor of O'Quinn holding that Whitney had received sufficient funds to fully satisfy the promissory note. Whitney filed a suspensive appeal and the case was consolidated in this court with the earlier Whitney case.
Initially, we shall treat the significant issues arising out of the Whitney suit. Whitney was specifically concerned with the validity of the note and the question of liability, if any, of the several indorsers thereon. In this regard, the indorsers had argued that the bank's actions, i.e., failure to inform the parties of the interest rate changes, misrepresentation regarding the amount of collateral available, material alteration, improper imputation of payment, equitable estoppel, renewal, novation, etc. relieved the parties of any liability on the subject note. The facts were heard before a commissioner and a report and recommended judgment were prepared in accordance with LSA-R.S. 13:1171. Following a hearing on exceptions to the findings of the report of the commissioner, the district court judge concluded that there was no merit to the many objections to the commissioner's report except for those concerning the portion of the judgment granting contribution. Accordingly, the district court judge entered his final judgment holding each of the several indorsers liable in solido for the face value of the note at the stated rate of 8½% interest.
The major issues to be decided by this court based upon the Whitney record are: (1) are indorsers who signed at a later date to be considered as accommodation indorsers and thus not primarily liable on the note; (2) did a material alteration take place when the bank made marginal notations of interest rate changes; (3) did Whitney make misrepresentations which would support a plea of contractual error, fraud, or equitable estoppel; and (4) is R.S. 13:1171 which allows for referral of certain cases to a commissioner constitutional.

STATUS OF THE PARTIES
The defendants who signed the note at a later date contend that they are only secondarily liable as indorsers pursuant to R.S. 7:63.[2]
The record reflects that Dr. Hegre and O'Quinn signed the subject note in the latter part of 1975, and that Drs. Christianson, Brown and Derbes signed either on or shortly after the making of the note. The principal argument of those who signed at a later date is that there was no consideration received for their signatures since the subject funds had been transferred at an earlier date. Specific reference is made to the language on the back of the note which states:
"In consideration of the making at the request of the undersigned of the loan evidenced by the within note, the undersigned has taken notice of the conditions and promises on the reverse hereof, and binds himself in solido by each and all of them, as there stated."
In this regard, it is clear that the absence of consideration received by either an accommodation indorser, guarantor, or surety has no bearing on the underlying obligations of these parties. See Guaranty Bank & Trust Company v. Carter, 394 So.2d *1190 701 (La.App. 3rd Cir.1981) and Cameron Brown South, Inc. v. East Glen Oaks, Inc. 341 So.2d 450 (La.App. 1st Cir.1976). By the terms of the subject note the defendant indorsers are obligated in solido with the maker of the note to Whitney Bank. Whether or not the indorsers are considered accommodation parties to the maker has no effect on their status as primary obligors to the bank since any indorser who signs a note containing such language is primarily liable to the payee. Bonart v. Rabito, 141 La. 970, 76 So. 166 (La.1917).[3]

MATERIAL ALTERATION
The indorsers allege that the markings placed in the margins amount to material alterations under Negotiable Instruments Law, LSA-R.S. 7:125 and 7:124, and should relieve them of any liability.[4]
Whitney counters that the cases of Deposit Guaranty National Bank v. Shipp, 205 So.2d 101 (La.App. 2nd Cir.1967), aff'd 252 La. 745, 214 So.2d 129 (La.1968) and Malinda v. St. Philip, 138 So.2d 671 (La.App. 4th Cir.1962) stand for the proposition that where an interest rate is changed in the body of the note, the holder may collect the full amount of the note plus interest.
In Malinda, the change of interest rate was made with the consent of the maker. In Shipp, the Supreme Court noted that the defendant's failure to plead material alteration as an affirmative defense made any ruling on the issue unnecessary under LSA-C.C.P. Art. 1005. Thus, neither Shipp nor Malinda have specifically ruled upon the question of what liability an indorser on such an altered note should bear.
However, Malinda does provide the general principle that where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided as to all parties except any party who himself made, authorized or assented to the alteration and subsequent indorsers. Indeed, this principle has been upheld under the negotiable Instruments Law even though the alterations in question had been made good in good faith. Simmons v. Green, 18 La.App. 492, 138 So. 679 (La.App. 2nd Cir.1932).
Therefore, the question to be decided is whether or not these interest rate notations *1191 constitute a material alteration which would release the indorsers of their liability.
LSA-R.S. 7:124 and 7:125 are identical with the provisions of Section 124 of the Uniform Negotiable Instruments Act. A study of the decisions of other jurisdictions which have adopted the act reveals that an alteration of an interest rate in a note is a material alteration warranting discharge of all parties not consenting thereto.[5] However, there have also been decisions which have held that marginal notations are not material where they have no bearing on the legal effect of the note. In this regard, the distinction between material and immaterial alterations is to be based upon whether the alteration affects or attempts to affect the terms of the contract or merely represents a memorandum or a collateral agreement which does not in any way change the force and effect of the instrument.[6] We find this rationale applicable to the case now at bar.
The witnesses for the bank had testified that the changes in the interest rates on demand loans were made according to the prevailing market conditions and that a notice of rate change was sent to Elks Place about seven days prior to the effective date of such a change. The bank suggests that this system of rate change binds the indorsers since Farber acted as their agent in his capacity as managing partner of the Elks Place Partnership. The indorsers argue that Farber lacked the agency authority to bind them in their individual capacities.
We find that although Farber had authority to bind the Elks Place Partnership, as far as the individual indorsers are concerned, the noted changes of interest rate are only marginal notations which do not change the legal effect of the note since they merely represent a separate agreement of the maker (Elks Place) to pay a higher rate of interest in exchange for the bank's not calling the note due.[7]

FRAUD, ERROR, EQUITABLE ESTOPPEL
The alleged fraud in the Whitney suit arises out of the defendant's pleadings which contend that an officer of the Whitney Bank made misrepresentations that the note would be paid off out of funds obtained from permanent financing. The commissioner's report which was adopted by the trial judge stated that the testimony revealed that although the expectation of all parties was that this note was to be discharged when the project was completed and permanent financing obtained, such was never made part of the agreement between the parties. In this regard, the commissioner suggested that the ultimate financial demise of the partnership was a risk which should be borne by the parties who had signed the note since they were all well educated and well advised of the consequences of their actions. Upon review of the record, we find no manifest error in regard to the findings of the trial court pertaining to the pleas of fraud, error and equitable estoppel. Canter v. Koehring Co., 283 So.2d 716 (La.1973) and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).

CONSTITUTIONALITY OF THE COMMISSIONER'S SYSTEM
The indorsers further argue that the referral of the subject case to a commissioner pursuant to R.S. 13:1171 violated their constitutional right to be heard by an elected judge as provided for by Art. 5 of the Constitution of 1974.
In Bordelon v. Louisiana Department of Corrections, 398 So.2d 1103 (La.1981) the *1192 court held that R.S. 13:713 establishing the commissioner procedure for the 19th Judicial District Court was not unconstitutional. The court concluded that "certain judicial power may be delegated without any abdication of the judge's fundamental responsibility for deciding cases" and that "delegations of power to conduct evidentiary hearings and to prepare proposed findings of fact and recommendations for disposition based upon the evidence and arguments is not inconsistent with the constitution and laws which vest the judicial power in judges of enumerated courts, as long as the judges retain the responsibility for making the ultimate decisions in the case." (At 1105)
R.S. 13:1171 succinctly sets forth the procedure to be followed when a case is referred to a commissioner, and that procedure has been discussed by this court on prior occasions.[8] The commissioner's authority is limited to gathering the facts and making a recommendation to the trial judge. The trial judge is vested with the ultimate authority to render final judgment. In this regard the commissioner's role may be constitutionally viewed as a judicial assistant or special master to whom a case is referred by the judge for 13:1171 does not purport to vest judicial power in commissioners since they cannot render judgment. Franklin Printing Co., Inc. v. Collin, supra.
Additionally, it should be noted that R.S. 13:1171 provides a procedure whereby exceptions can be filed to the commissioner's report and recommendation. The statute requires that the trial judge set the exceptions for hearing, hear argument, and decide the exceptions on the record as made up before the commissioner. A review of the record presently before this court, reveals that following the filing of the commissioner's report and the hearing of the exceptions thereto, the trial judge reviewed the record, read all the pleadings and memoranda of counsel, heard the objections to the commissioner's report and recommendations, and rendered his judgment on the subject case. Upon these facts, we find no merit to the appellants' contention that their constitutional rights had been violated.
Having disposed of the significant issues raised by the defendants in the Whitney case, we turn to the issues involved in the O'Quinn case.
Whitney asserts under local court rules[9] the trial judge in O'Quinn should have granted its motion to transfer the second lawsuit to the court which heard the Whitney case. Considering the nature, allegations and objectives of the two lawsuits, we find that the Whitney case should have been treated as part of the previously pending suit. The injunctive relief requested grew out of the prior suit. The subject local court rule allows the district court judge to whom a case has been improperly allotted to transfer the case to the proper division. If the trial judge refuses to do so the party is entitled to seek a supervisory writ from this court directing the clerk of court to properly allot the case in accordance with the rule. However, since the complete record is before us for review no purpose would be served by remanding the case for retrial of the issues.
The bank received substantial monies after the Whitney trial ended on June 19, *1193 1980. Whitney argues our March 5, 1981, order limited evidence in O'Quinn to sums received after November 10, 1980, when the Whitney judgment was signed. Whitney's interpretation would allow the bank to avoid accounting for money it received during the 143 day period after trial and before the judgment was signed. We find that the funds collected by the bank during this interval must be considered in order to determine if the note's imputation clause applies and what balance (if any) is owed on the note.

APPLICABILITY OF IMPUTATION CLAUSE
The note's imputation of payments clause states:
"All parties hereto hereby authorize and empower said Bank, at any time, to appropriate and apply to the payment and extinguishment hereof and/or of any of the obligations or liabilities, direct or contingent, of any of the parties hereto, whether now existing or hereafter arising, and whether then due or not due, up to the amount of $15,000,000.00, said bank being authorized to impute the payments as it sees fit, any and all moneys, stocks, bonds, or other property of any kind whatever now or hereafter in the hands of said Bank on deposit or otherwise to the credit of or belonging to any party hereto, including any moneys or other property in transit to or from said Bank for any purpose."
Whitney contends this language gave it authority, without limitation, to apply any payments made on behalf of the partnership or its partners to any obligation of the partnership or any of its limited partners. Though this is a standard imputation clause, its interpretation and the question here on its application is res nova.
Whitney argues in brief: "(T)he $15,000,000.00 limitation is a cap on the pledge obligation of each maker, endorser and guarantor, which many bank attorneys feel is required by the Civil Code articles on pledge." Whitney asserts the fifteen million dollar figure is not a limit on the holder's (bank's) right to impute, but rather on the amount of an individual's collateral that the bank can hold at one time. We disagree. The note states the bank is authorized to apply "... as it sees fit, any and all moneys, stocks, bonds or other property of any kind whatever ... belonging to any party hereto" "... to the payment and extinguishment ... of any of the parties hereto ... up to the amount of $15,000,000.00" (our emphasis). Since Whitney prepared the promissory note any ambiguity must be resolved against it. We interpret the fifteen million dollar provision as establishing a limit upon Whitney's right to impute payments at its sole discretion. Once that limit is reached Whitney's discretionary right to impute ends.
Whitney claims O'Quinn was precluded from raising the imputation issue in the O'Quinn suit because of collateral estoppel, res judicata and lis pendens. Collateral estoppel is not susceptible of application in a civil law jurisdiction. Welch v. Crown Zellerbach Corp., 359 So.2d 154 (La. 1978). Res judicata is not applicable because a final judgment had not been rendered in the first suit. LSA C.C. Arts. 2285, 2286. However, lis pendens has already been held to be applicable to all issues previously litigated.[10] In this regard we find that this aspect of imputation (the fifteen million dollar limit) was not raised, litigated or decided in the first suit and was properly raised in the O'Quinn suit.

COMPONENTS OF THE $15,000,000.00 LIMIT
During the O'Quinn trial Mike Kingsberry, C.P.A., an expert witness for O'Quinn, determined from subpoenaed bank records that Whitney received payments totaling $19,918,693.64 on Farber-related accounts since the note was executed on July 12, 1973. Whitney complains the sources of payments included by Kingsberry were inappropriate because the records were from *1194 seven separate loan accounts, i.e., other Farber borrowing entities, but the bank admits "... (n)othing in the record connects the loans except that Dr. George A. Farber was a maker, indorser or guarantor of each loan." (our emphasis). Whitney objected only to the source of the payments and did not produce any evidence to rebut the amounts included by Kingsberry. In any event, we are not inclined to analyze the payments in detail because of the ultimate result we reach in the case. Although we conclude that an aggregate of fifteen million dollars was received by the bank prior to the end of trial in Whitney on June 19, 1980, and that Whitney's discretion to freely impute payments had ceased; we find that Whitney was not obliged to impute payments made subsequent to June 19, 1980, to the obligation of defendants on the subject note.

IMPUTATIONS OF PAYMENTS
Once the fifteen million dollar limitation was exceeded Whitney no longer had the right to impute payments as it saw fit. Instead, imputation was thereafter controlled by the following codal articles:
"Art. 2163. DEBTOR'S RIGHT TO MAKE IMPUTATION. The debtor of several debts has a right to declare, when he makes a payment, what debt he means to discharge."
"Art. 2165. IMPUTATION BY CREDITOR'S RECEIPT. When the debtor of several debts has accepted a receipt, by which the creditor has imputed what he has received to one of the debts specially, the debtor can no longer require the imputation to be made to a different debt, unless there have been fraud or surprise on the part of the creditor."
"Art. 2166. LEGAL ORDERS OR IMPUTATION. When the receipt bears no imputation, the payment must be imputed to the debt, which the debtor had at the time most interest in discharging, or those that are equally due; otherwise to the debt which has fallen due, though less burdensome than those which are not yet payable.
If the debts be of a like nature, the imputation is made to the debt which has been longest due; if all things are equal, it is made proportionally."
The pertinent amounts received after the fifteen million dollar limitation was reached are described as follows:
1. $704,386.67Received by Whitney on October 29, 1980 from the foreclosure sale of Elk Place Medical Plaza.
2. $4,246.23Received by Whitney on November 10, 1980 from Harris Mortgage Corporation for application to the debt of Elk Place Medical Plaza.
3. $445,059.09Received by Whitney from the sale of Farber stock on February 5 and 6, 1981, applied to two loans made by Farber.
The $704,386.67 received by Whitney on October 29, 1980, was the balance of the sales price received by the sheriff on the foreclosure sale of Elk Place Medical Plaza. Whitney held a second mortgage on the building, and applied the funds to those Elk Place partnership loans secured by said mortgage. Common sense dictates that O'Quinn and Hegre cannot contest this imputation. The sheriff had to deliver the funds remaining after discharge of the first mortgage to the next ranking mortgage holder. We are unaware of any legal principle which prevents that second mortgage holder from applying those proceeds to the secured debt and requires it to apply them to some other debt for the sole benefit of the other debt's surety.
Furthermore, the law supports Whitney's position. Since the debtor made no direction as to application of payment and hence "accepted receipt" of the payment, Whitney's imputation was proper. C.C. Art. 2165. "When a creditor imputes the payment and informs the debtor of the imputation by a statement of account, the debtor who accepts the statement or receipt without objection or is silent is estopped from questioning the imputation." Marks v. Deutsch Construction Co., 258 So.2d 676 (La.App. 4th Cir.1972), 678, 679. See also, *1195 Romero & Sons Lumber Company v. Babineaux, 151 So.2d 714 (La.App. 3rd Cir.1963).
The $445,059.09 received by Whitney on February 5 and 6, 1981 from the sale of Farber stock was applied to the credit of various personal loans of Dr. Farber. This was done by the explicit direction of Dr. Farber, and the record is devoid of any evidence that the stock was pledged to secure the note indorsed by O'Quinn. On the contrary, C.C. Art. 2163 specifically provides that a debtor of several debts has the right to declare which debt he means to discharge.
The record is not clear as to the application of the funds received from the Harris Mortgage Corporation. However, the same rules of imputation are applicable. If the debtor, Elk Place Partnership or Farber, directed application of the proceeds to a particular debt, Whitney was obliged to do so. If Whitney imputed by receipt, without objection from the debtor, the guarantor has no standing to object.
A third party, including an indorser, cannot force the debtor to impute his payment in a particular fashion, nor can he abrogate the creditor's right to impute by receipt when the debtor has failed to declare. See, Imputation of Payment; A Study of Obligations, 38 Tul.L.R. 31. See also Grand Lodge, etc. v. Murphy Const. Co., 152 La. 123, 92 So. 757 (1922); Thompson & Co. v. Sporl, 160 La. 352, 107 So. 135 (1926).
We have thus concluded that defendants are not entitled to any of the credits they claim on the note sued on in the Whitney case and the trial judge in the O'Quinn case erred in his conclusion that note was satisfied and extinguished.
Finally, we turn to Whitney's answer to the appeal in which it seeks an increase in the interest of 8½% allowed by the trial court in Whitney.
Whitney contends that it was allowed to charge a "floating rate" of interest on the subject note. The allowed 8½% interest was the amount set out in the original note. During the life of the loan Whitney fluctuated its interest rate to as high as 11¾% on April 1, 1979. "Floating" interest rates are not uncommon in financial circles. They are a very integral part of the lending industry. However, in order to bind obligors to such practices they must be advised of same and have consented to it. In the instant case, the note merely stated 8½% interest. No mention was made of a floating rate in the body of the note, nor was there any other agreement indicating consent on behalf of the parties to a fluctuating rate. While Farber may have consented to changes in the interest rate there is no evidence that any of the indorsers consented or even had knowledge of the purported changes when they occurred. Whitney had no authority unilaterally to change the interest rate of its loan without the consent of the parties thereto.
Accordingly, the judgment in favor of the Whitney National Bank in Suit No. 79-8183 of the Civil District Court against Dr. Vincent J. Derbes, Dr. Gary R. Brown, Dr. Herbert B. Christianson, Dr. Andrew M. Hegre and Lloyd D. O'Quinn is affirmed.
The judgment in favor of Lloyd D. O'Quinn in suit No. 81-1399 of the Civil District Court is reversed and set aside and there is judgment in favor of Whitney National Bank of New Orleans, dismissing Lloyd O'Quinn's suit at his cost, including the cost of the appeal.
Our Docket No. 12411 AFFIRMED.
Our Docket No. 12752 REVERSED AND RENDERED.
WARD, J., concurs.
BARRY, J., dissents.
WARD, Judge, concurring.
Although I agree with the majority's treatment of most issues and with its conclusion, I disagree with the treatment of the issue of imputation of payments. That part of the note which purports to grant Whitney the right to impute payments is so permeated with legalese that it is ambiguous at best and non sensical at worst, and *1196 the majority, in my opinion, misinterprets the imputation clauses of the note.
After eliminating the legalese and after inserting the obvious, I submit the following extract is a more accurate interpretation of the right of Whitney to impute payments.
All parties ... agree that the payment hereof may be extended from time to time, one or more times, without notice...
The property described on the reverse hereof, and any property that may be substituted therefor ... are hereby pledged ... to [Whitney] to secure the payment of this note, and of any note given in extension ... as well as for the payment of any other obligation ... of any of the parties hereto to [Whitney]... up to the amount of $15,000,000.00.... All parties ... agree that the property... pledged may be exchanged [for other pledged property] or surrendered... without notice to or assent from any party ... [and] ... full irrevocable power and authority are hereby granted and given to [Whitney] ... upon this note not being paid at maturity, to sell, ... the whole of the property of every kind pledged .... [and Whitney] may apply the residue of the proceeds of sale or sales, pro tanto, to the payment of any or all of the obligations or liabilities of the parties hereto or [to] any of them, whether then due or not due, up to the amount of $15,000,000.00 ...
[Additionally] All parties ... authorize... [Whitney] to appropriate [any of the property described below] and [to] apply to the payment ... [of this note] or of any of the obligations ... of any of the parties hereto, ... [the proceeds from the sale of that property] up to the amount of $15,000,000.00, [and Whitney is] authorized to impute the payments as it sees fit, [of] any and all moneys, stocks, bonds, or other property of any kind whatever now or hereafter in the hands of said Bank on deposit or otherwise to the credit of or belonging to any party hereto.... All parties ... authorize [Whitney] ... to collect, ... and apply to the payment and extinguishment [of the note] the interest, dividends, or other income accruing and payable on any of the property pledged to secure the payment hereof....
The note speaks of property, not payments on the note or payments on other indebtedness of the parties, and it should not be interpreted to include payments. The note as I interpret it does not give Whitney the unfettered right to impute payments as it sees fit except from proceeds of the sales of property pledged to secure the note or from money, stocks, and bonds belonging to the parties and then in the hands of Whitney. Hence, imputation of all payments now in dispute should follow the provision of Articles 2163, 2165, and 2166 of the Civil Code.
BARRY, Judge, dissenting:
The note plainly states the bank is authorized to apply "... as it sees fit, any and all moneys, stocks, bonds or other property of any kind whatever ... belonging to any party hereto" ... "to the payment and extinguishment ... of any of the obligations or liabilities, direct or contingent, of any of the parties hereto ... up to the amount of $15,000,000.00" (my emphasis). The majority correctly interprets this as clearly establishing a $15 million limit upon Whitney's right to impute, but falls into error when applying the provision to several payments the bank received following the Whitney trial.

COMPONENTS OF THE $15,000,000 (see appendix)
Whitney's records (produced under subpoena) show the bank received payments totalling $19,918,693.64 on Farber-related accounts since the note was executed on July 12, 1973.[1] Each collected amount represents an obligation or liability "direct or contingent" of a "party" (Farber) to the subject note. Based on the bank's records, *1197 payments totalling $17,771,215.61[2] were imputed by Whitney to Farber-connected accounts prior to the close of trial in Whitney; therefore, the bank's discretion to impute payments had ceased and the partnership note should have been reduced accordingly. However, the majority wrongfully concludes that Whitney "was not obliged to impute payments made subsequent to June 19, 1980," then goes on to explain why the various amounts should not be credited to the note. I'm satisfied the payments received subsequent to June 19, 1980 should be credited against the note because of the source of these payments.

IMPUTATION OF PAYMENTS (see appendix)
After the $15 million limit was reached, codal articles on imputation of payments (LSA-C.C. Arts. 2163 et seq.) are applicable to funds attributable to the partnership note. Under these provisions payments go to the debt "... which the debtor had at the time the most interest in discharging, of those that are equally due.... If the debts be of a like nature, the imputation is made to the debt which has been longest due ..." LSA-C.C. Art. 2166. Any interest due must be paid either first or concurrently with principal. LSA-C.C. Art. 2164. Certainly the debtor (Farber) had "the most interest in discharging" this debt (secured by a surety)[3] and the record shows it was the "longest due." Hence, once $15 million was exceeded, this note should be the first debt paid out of money collected by the bank on behalf of the partnership account.
The bank argues this issue was litigated in Whitney and was precluded by an order from this Court. The $15 million cap was not raised in Whitney.[4] These payments were received after the first trial ended and the $15 million had been reached. Therefore, this matter could not have been litigated in Whitney and payments received by the bank were not barred from consideration by our March 5, 1981 order.[5]
Whitney also complains that the rules of imputation can be evoked only by the "debtor of several debts"[6] (Farber) and not the surety. That reasoning is illogical. The debtor and creditor have more freedom to act in their dealings when only their interests are affected rather than when others may be prejudiced by their actions.
After the Whitney trial, the note was placed in a separate account by the bank.[7] There were foreclosures on properties and stocks and other collateral were sold, most of which had at one time been pledged by Farber to secure this particular note.[8] Proceeds from the foreclosures and sales of collateral were intentionally credited by the bank to other debts of Farber and Elk Place at Whitney's discretion and Farber's direction. None of the endorsers had notice of the proceedings and did not know how the money was applied by the bank. Whitney and Farber were aware this diversion of funds was to the detriment of the note's endorsers because Elk Place and Farber were in bankruptcy and would never be able to reimburse the sureties (as provided by law) if they were called upon to pay this note.
Under these circumstances, I believe it is unconscionable to allow Whitney and Farber to agree to divert payments to the *1198 prejudice of the five endorsers. The sureties had the right to demand imputation as provided by law and their intent should have been manifest to Whitney and Farber after the Whitney trial. See Duffy v. Roman, 209 So.2d 502 (La.App. 4th Cir.1968), Grand Lodge, Benevolent Knights of America v. Murphy Construction Co., 152 La. 123, 92 So. 757 (1922), R.P. Fransworth & Co. v. Electrical Supply Co., 112 F.2d 150 (5th Cir.), cert. denied, 311 U.S. 700, 61 S.Ct. 139, 85 L.Ed. 454 (1940).

MANDATORY CREDITS AFTER IMPUTATION
The following sums received by Whitney subsequent to the end of the Whitney trial on June 19, 1980, should have been credited:
1. $704,386.67Received by Whitney on October 29, 1980 from foreclosure sale of Elk Place Medical Plaza. (Exhibit P-20)
2. $4,246.23Received by Whitney on November 10, 1980 from Harris Mortgage Corporation for application to the debt of Elk Place Medical Plaza. (Exhibit P-20)
3. $445,059.09Received by Whitney from sale of Farber stock on February 5 and 6, 1981. This amount was applied to two loans made by Farber. (Exhibit P-19)[9]
Farber admitted at trial that the stocks which were "sold"[10] had been pledged to secure the Elk Place debt. (Testimony of March 6, 1981, p. 27). Whitney's only explanation was this amount represented all pledged stock held by the bank registered in the names of Dr. and Mrs. Farber, except Coldwell Mortgage and Fairgrounds stock. The court in O'Quinn found that these stocks (i.e. those "sold") were pledged to secure the subject note. In light of Farber's testimony and the July 11, 1973 letter (Exhibit P-25) from Farber to Treuting regarding the pledge of stock, I do not find that conclusion erroneous.
Whitney also objects to the inclusion of stock proceeds to extinguish the note based upon Farber's testimony that he and Whitney agreed this amount would apply to his personal loans (see footnote 9, supra.) As stated above, subsequent to the first trial and the $15 million limit being met, under the circumstances of this case, the debtor and creditor were not at liberty to direct payments to the prejudice of the endorsers.[11] Farber owed several debts to Whitney and the endorsers herein had the right to imputation in order to protect their positions. These stocks were owned by Farber and pledged to secure this note; unquestionably, the proceeds should have been imputed to this note.[12]
The following assets, when liquidated, should also be imputed:
1. Coldwell Mortgage36,150 Common Shares
 3,200 Preferred Shares
 Fairgrounds4,196 Common Shares.
Mr. Hart, Whitney's vice president, testified these stocks were held by the bank, *1199 belonged to Farber, and were in the process of being sold. Farber testified: "There's been agreed a private sale of these stocks which is waiting on a clarification from Judge Bernard of the bankruptcy court." O'Quinn argues these stocks were pledged to secure the note, citing the July 11, 1973 letter. The stocks were not specifically listed in that letter, but Farber stated he estimated 40% of these stocks were pledged to secure Elk Place (testimony March 6, 1981, p. 29). The evidence is sufficient to require imputation.
2. Funds held by bankruptcy court.
Richard Leefe, attorney representing Elk Place, Harvey Oil Center, and Farber in three bankruptcy proceedings, testified that "approximately two hundred thousand dollars" was available in the Elk Place bankruptcy and Whitney was the largest unsecured creditor. If Whitney receives money from the bankruptcy court on the Elk Place account it should be imputed to the note.
3. $10,000Certificate of Deposit due March 26, 1981.
At the time of trial (March 5, 1981) the certificate had not matured, but testimony does not confirm that the C.D. was in the name of Elk Place. Whitney's Mr. Hart was the only person to testify regarding this item when referring to securities pledged by Farber to Whitney. Whitney's brief states the C.D. was actually issued in the name of and pledged by Farber. O'Quinn argues it is irrelevant whether issued in Farber's or Elk Place's name as it was clearly available as a credit. If issued in either name, when the money was (or is) received it should be credited to this note.

ITEMS NOT SUBJECT TO IMPUTATION
The O'Quinn court erred by including the following amounts for credit to the Elk Place account:
1. $109,000.00Sale of West Bank Petroleum Club note purchased by Whitney at public sale.
Mr. Hart was the only person to testify regarding this transaction and stated the note was from a tenant of the Harvey Oil Center and pledged by Dr. Farber and Mr. Leefe as security to any of their obligations. This was not refuted by O'Quinn. The amount was credited by Whitney to the Harvey Oil Center account on February 4, 1981. O'Quinn argues it should be a credit because the note was part of the properties cross-collateralized on the cross-pledge of September 24, 1978. However, Mr. Leefe had no association with Elk Place and the evidence is insufficient to allow a credit.
2. $32,240.00Payments in excess of the note's 8½% interest.
This issue was litigated in the Whitney suit. Elk Place, the maker, acquiesced in higher interest rates and that money cannot be recouped by the endorsers.

SUMMARY
The following amounts should be imputed for credit on the partnership note as of the specified dates:

 $ 704,386.67 - as of October 28, 1980
 4,246.23 - as of November 10, 1980
 441,359.95 - as of February 5, 1981
 3,699.14 - as of February 6, 1981
_____________
$1,153,691.99
_____________

In addition, the unliquidated assets (Coldwell and Fairgrounds stock, bankruptcy funds, and C.D.) should be credited whenever received by Whitney.
The Whitney Bank, assisted by Farber, was in the driver's seat throughout this scenario. The endorsers were at the mercy of the bank and its imputation clause (agreeably and legally) up to the bank's self-imposed limitations in the clause. Thereafter, the very purpose of the clause came into play, namely, to protect these endorsers.
O'Quinn should be remanded to complete the accounting of funds received by Whitney in order to determine what balance, if any, is owed to Whitney Bank after considering all permissible credits.
I should also point out that the majority has failed to treat O'Quinn's argument relative *1200 to the Difficiency Judgment Act. Serious questions were raised and are unanswered which could effectively alter the majority's disposition of this obligation.

 APPENDIX
 LESS PAYMENTS RECEIVED
 WHITNEY-FARBER PAID TO WHITNEY AS AFTER WHITNEY TRIAL AMOUNTS TO CALCULATE
 LOAN ACCOUNTS PER KINGSBERRY (AS PER EXHIB IMPUTATION 
Elk Place Medical Plaza $ 7,179,554.54 $ 60,000.00 $ 7,101,147.58
Liability Ledger Card 18,406.96
George A. Farber, M.D.
James W. Burks, M.D. 86,500.00 -0- 86,500.00
Farlee Company 4,337,337.24 442,522.33 3,614,602.18
 268,098.06
 12,114.67
George A. Farber, M.D. 3,730,813.95 109,000.00 3,621,813.95
Guy L. Leefe, Jr.
Burks Dermatology & 120,332.30 -0- 120,332.30
Allergy Clinic
Mrs. Alma L. Burks 107,000.00 -0- 107,000.00
George A. Farber, M.D.
Elk Place Medical Plaza 977,694.64 -0- 977,694.64
 173,848.70 173,848.70
 390,708.79 390,708.79
Farlee Company 504,795.50 -0- 504,795.50
George A. Farber, M.D. 634,301.19 -0- 634,301.19
Guy L. Leefe, Jr.
George A. Farber, M.D. 114,826.62 103,910.44 -0-
 48.65
 10,867.53
Elk Place Medical Plaza 630,225.94 555,541.04 -0-
(Foreclosure) 3,821.60
 70,438.67
 424.63
George A. Farber, M.D. 438,470.78 -0- 438,470.78
and Guy L. Leefe, Jr.
Farlee Co. Foreclosures 492,283.45 134,291.84 -0-
 208,968.52
 19,324.17
 8,197.09
 14,921.31
 42,529.17
 12,527.17
 17,331.52
 31,935.80
 2,256.86
 370,781.62
 121,501.83
 ______________ _____________ ______________
 $19,918,693.64 $2,147,478.03 $17,771,215.61
 ============== ============= ==============

ON REHEARING
PER CURIAM.
In their application for rehearing the indorsers complain that we did not address their argument that they were discharged because of the Louisiana Deficiency Judgment Act, LSA C.C.P. Arts. 2771 and 2772, R.S. 13:4106, and they ask for a rehearing on this basis.
*1201 The Deficiency Judgment Act has no application to the case because the indorsers had no interest in the property foreclosed upon and the property was sold with appraisement after due notice to the owners of the property. Cameron Brown South, Inc. v. East Glen Oaks, 341 So.2d 450 (La. App. 1st Cir.1976), Ford Motor Credit Company v. Soileau, 323 So.2d 221 (La.App. 3rd Cir.1975), Gumina v. Dupas, 178 So.2d 291 (La.App. 4th Cir.1965), writs refused 248 La. 442, 179 So.2d 430 (1965).
REHEARING DENIED.
BARRY, Judge, would grant a rehearing.
I disagree with the majority's treatment of the imputation clause for the detailed reasons in my dissent.
O'Quinn raises a number of substantial issues, some of which are treated summarily and one of which was ignored:
"I should also point out that the majority has failed to treat O'Quinn's argument relative to the Difficiency Judgment Act. Serious questions were raised and are unanswered which could effectively alter the majority's disposition of this obligation." (See Dissent, pp. 1199-1200.)
NOTES
[1] Specifically, this court's order of March 5, 1981, was premised on C.C.P. Art. 2298(2) which entitles the judgment debtor to seek injunctive relief if the judgment has been extinguished by payment made subsequent to the judgment. The order specifically stated:

"The intent of our order was clear. The debtor is not entitled to Art. 2298 relief by further temporary restraining orders, but his rights under Art. 2298 to seek an injunction are preserved. We repeat, however, that lis pendens (our earlier `res judicata' was a misnomer) precludes relitigating the defenses litigated in the earlier suit now pending on appeal."
[2] In brief and oral arguments the parties have referred to provisions of the Negotiable Instruments Law found in Title 7 of the Revised Statutes. This was repealed by Act 92 of 1974 and replaced by the Commercial Law found in Title 10. Since the new laws became effective on January 1, 1975, they were in effect when Hegre and O'Quinn became indorsers. The result we reach is the same under either law, but the position of Hegre and O'Quinn is weakened considerably if the new law is applied.

R.S. 7:63 provides: Persons deemed indorsers: A person placing his signature upon an instrument otherwise than as maker, drawer, or acceptor is deemed to be an indorser, unless he clearly indicates by appropriate words his intention to be bound in some other capacity. Replacement R.S. 10:3-402 provides: Unless the instrument clearly indicates that a signature is made in some other capacity it is an indorsement.
[3] Such is true even if the principal maker is discharged in bankruptcy proceedings. Meadow Brook National Bank v. Massengill, et al, 427 F.2d 1055 (5th Cir.1970).
[4] LSA-R.S. 7:124 reads: Alterations, effect of.

Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided, except as against a party who has himself made, authorized, or assented to the alteration and subsequent indorsers. But when an instrument has been materially altered and is in the hands of a holder in due course, not a party to the alteration, he may enforce payment thereof according to its original tenor.
LSA-R.S. 7:125 reads: Materiality of alteration, any alteration which changes:
(1) The date;
(2) The sum payable, either for principal or interest;
(3) The time or place of payment;
(4) The number or the relations of the parties;
(5) The medium or currency in which payment is to be made; or which adds a place of payment where no place of payment is specified, or any other change or addition which alters the effect of the instrument in any respect, is material alteration.
However, replacement R.S. 10:3-407 provides: Alteration
(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in
(a) the number or relations of the parties; or
(b) an incomplete instrument, by completing it otherwise than as authorized; or
(c) the writing as signed, by adding to it or by removing any part of it.
(2) As against any person other than a subsequent holder in due course
(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;
(b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given.
(3) A subsequent holder in due course may in all cases enforce the instrument according to its original tenor, and when an incomplete instrument has been completed, he may enforce it as completed.
[5] See decisions pertaining to interpretation of 5 Uniform Laws annotated § 124 and § 125.
[6] See: 3A C.J.S. Alteration of Instrument § 34(b), 4 Am.Jur.2d, Alteration of Instruments § 55, and A.L. Harrington Co. v. Barron, 15 La.App. 187, 131 So. 503 (La.App. 2nd Cir. 1930) for discussion of marginal memorandum or notations on notes.
[7] Under present R.S. 10:3-407 a change in interest is not specifically mentioned as a material alteration as was so in R.S. 7:125. Furthermore, R.S. 10:3-407(2)(a) provides that an alteration must be both fraudulent and material to discharge a party.
[8] Boe v. Lake Forest, Inc., 384 So.2d 850 (La. App. 4th Cir.1980); Franklin Printing Co., Inc. v. Collin, 376 So.2d 1323 (La.App. 4th Cir. 1979) and Lane v. Lane, 375 So.2d 660 (La.App. 4th Cir.1978).
[9] Rule 8, Section 9, of the Civil District Court for the Parish of Orleans provides:

"Suits or proceedings that are filed subsequent to suits or proceedings already filed but which grow out of those previously filed suits or proceedings shall not be docketed as separate suits but shall be treated as parts of the previously pending suits and shall follow the prior allotment or assignment to the respective divisions of the Court. However, all motions for a new trial and all actions for nullity shall be heard by the judge who signed the original judgment. Whenever, by error or by oversight, this rule shall be violated, the judge to whom the matter shall have been allotted shall have the power to order same transferred to the proper division, there to be consolidated with the previously pending suit."
[10] See footnote 1.
[1] Dr. Farber apparently had an extraordinary entree or working relationship with Whitney Bank personnel, as shown by the voluminous and inordinate loans in this record.
[2] O'Quinn's expert, Mike Kingsberry, C.P.A., testified that $19,918,693.64 was received on Farber-related accounts prior to the close of the Whitney trial. I have amended this figure to exclude payments that were in fact received after June 19, 1980, the close of trial in Whitney.
[3] Calatex Oil & Gas Co. v. Smith, 175 La. 678, 144 So. 243 (1932). Although the parties were bound in solido on the note, the endorsers maintained their status as sureties vis à vis the maker.
[4] The issue was raised for the first time in the Whitney appeal.
[5] Case # 12367 dated March 5, 1981
[6] LSA-C.C. Art. 2163
[7] See Exhibit P-20
[8] See the cross-collateral pledge agreement dated September 25, 1978, Farber's July 11, 1973 letter to Mr. Robert Treuting, vice president of Whitney, and Farber's testimony on March 6, 1981.
[9] The first loan, for $428,000, was made on November 15, 1978 and due March 14, 1979. The second was a demand note, executed February 9, 1979 in the amount of $61,500. On February 5 and 6, 1981, payments in the amount of $114,826.62 toward interest and $330,232.47 toward principal were made on these two notes, leaving a balance of $159,267.53.
[10] There is no identifying information in the record regarding this block of stocks. Two groups of stock were referred to in Farber's testimony: one group of stocks that had been "sold," and another group not yet sold consisting of Fairgrounds and Coldwell Mortgage stock.
[11] When questioned why he asked Whitney to use this money to pay his personal debts, he stated:

"Why not? I owed all of these debts and that's what I originally intended it for and I would rather have my own loan paid off than pay for people that may or may not still be friendly or may or may not have some problems, too. It would be stupid for me to say: Pay off somebody else's first."
[12] Whitney again objects stating this issue was litigated in the first suit. The first suit did not determine the issue of collateral behind the note. Also, these sums were received by Whitney on February 5 and 6, 1981, long after the first trial ended.